UNITED STATES of America, Appellee,

v.

James Francis MELVIN, Defendant, Appellant.

No. 78–1437.

United States Court of Appeals, First Circuit.

Argued Jan. 2, 1979.

Decided April 13, 1979.

---

Martin G. Weinberg, Boston, Mass., with whom Judith H. Mizner, and Oteri & Weinberg, Boston, Mass., were on brief, for defendant, appellant.

Robert B. Collings, First Asst. U. S. Atty., Chief, Criminal Division, Boston, Mass., with whom Edward F. Harrington,

U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This is an appeal by James Francis Melvin from his conviction for the possession of two firearms, a sawed-off shotgun and a sawed-off carbine, which were not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d). The guns were discovered and seized by police officers during a search of Melvin's home pursuant to a warrant. Melvin contends that the district court erred in refusing to suppress the firearms as evidence against him at trial. He argues (1) that the search warrant was issued without probable cause; (2) that it was issued upon an affidavit containing a material false statement made in reckless disregard for the truth; and (3) that the seized weapons were the fruits of an interrogation conducted in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As we conclude that the district court properly admitted the seized firearms into evidence, we affirm the conviction.

## I.

We address first the question of probable cause. The warrant, authorizing the search of appellant's home at 38 Ells Avenue, Weymouth, was issued by a justice of the Massachusetts Superior Court upon the affidavit of Detective John E. Lydstone of the Boston Police Department. The objects sought by the search as authorized by the warrant were instrumentalities used in the commission of a bombing, not the firearms which were found and introduced against appellant at trial.[1]

In passing on the probable cause basis for the search warrant, we may consider only information brought to the issuing judge's attention. *Aguilar v. Texas*, 378 U.S. 108, 109 n.1, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The judge issued the warrant solely on the basis of Detective Lydstone's affidavit, which stated the facts in material respects as follows. At approximately 4:00 a. m. on November 18, 1976, there was an explosion at Rooney's Tavern in Dorchester, Massachusetts. Patrolman Arnstein of the Boston Police Department arrived at the tavern a few minutes after the explosion. According to the affidavit, shortly after Arnstein's arrival "an unknown male stated that a white Cadillac had left the scene moments before the explosion." Earlier that morning, at about 2:00 a. m., Arnstein while patrolling the area had noticed a white Cadillac parked in front of Rooney's Tavern and a white male, about 35 years old, 5'10" tall, and 180 lbs., standing at the tavern's front door. Detective Lydstone in the affidavit affirmed further:

"(5) That I gave photographs of persons known by me to frequent the area of Rooney's Tavern and Patrolman Arnstein indicated that a photograph of James Melvin bore a strong resemblance to the man that he had seen at the Tavern door at 2:00 AM that morning.

"(6) That James Melvin is a white male, 34 years, 5'-9", 165 lbs. is listed as an owner of Rooney's Tavern and that he operates a 1976 Cadillac, color white, Mass. Reg. D66–105 and he resides at 38 Ells Ave., Weymouth.

"(7) That at about 10:00 PM Thursday, November 18, 1976, Detective Martin Coleman of the Intelligence Division responded to 38 Ells Ave., Weymouth and observed that the white Cadillac belonging to Melvin was parked at that location."

1. Apparently none of the instrumentalities of the bombing sought by the warrant were found in the house, although the returned warrant reported that electrical and friction tape, a current tester, and six pairs of wire cutters had been discovered. The judge also issued a warrant authorizing a search of appellant's car, however, and appellant's brief indicates that what appeared to be part of a blasting cap was found in the car. Based on this evidence, appellant apparently was arrested for having caused the explosion, but he was acquitted after a trial in state court.

Lydstone stated also that Sergeant Ruglario and Patrolman Cunningham of the Boston Police Department's bomb squad reported finding at the rear of the tavern a 103 foot length of brown wire and another length of similar brown wire inside the tavern, the latter attached to yellow and blue wires of the type and in a configuration consistent with use in detonating a stick of dynamite, and that "[i]t is the opinion of these bomb squad officers that the above paraphernalia was in fact used to cause the explosions at Rooney's Tavern." Finally, Detective Lydstone requested a warrant for the following reasons:

"(8) That I have discussed the above stated facts and their inferences with other members of the Intelligence Division and it is our collective opinion that there is probable cause to believe that James F. Melvin was responsible for the explosion at Rooney's Tavern and respectfully request that the Court issue search warrant for Melvin's white Cadillac, Mass. Reg. D66–105.

"(9) I have discussed the facts and inferences of this case with Sgt. Ruglario and Patrolman Cunningham of the Bomb Squad. They inform me that the type of device capable of causing the above damage (at Rooney's Tavern) would generally be assembled in a workshop of some sort, as opposed to in the vehicle, because of the type of tools and materials needed to assemble the bomb. Therefore, I also request a search warrant for James Melvin's residence at 38 Ells Avenue, Weymouth, Massachusetts. That residence is described as a single-family, brown, two-story house with a garage attached."

The warrant was issued on November 19 and the search conducted later that day.

The fourth amendment protects against "unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause." The Supreme Court in *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969), summarized the principles that govern the issuance and review of search warrants. These "established propositions" are,

"that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, *Beck v. Ohio*, 379 U.S. 89, 96, [85 S.Ct. 223, 228, 13 L.Ed.2d 142] (1964); that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, *McCray v. Illinois*, 386 U.S. 300, 311, [87 S.Ct. 1056, 1062, 18 L.Ed.2d 62] (1967); that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, *United States v. Ventresca*, 380 U.S. 102, 108, [85 S.Ct. 741, 745, 13 L.Ed.2d 684] (1965); and that their determination of probable cause should be paid great deference by reviewing courts, *Jones v. United States*, 362 U.S. 257, 270–271, [80 S.Ct. 725, 735–736, 4 L.Ed.2d 697] (1960)."

■ Appellant misapprehends two fourth amendment principles which we wish to clarify at the outset. First, appellant reads the phrase "probable cause" with emphasis on the word "probable," and would define it mathematically to mean "more likely than not" or "by a preponderance of the evidence." This reading is incorrect. The phrase is less stringent than that—the words "reasonable cause" are perhaps closer to what is meant. The Supreme Court has asserted that "'reasonableness' is the overriding test of compliance with the Fourth Amendment," *Zurcher v. Stanford Daily*, 436 U.S. 547, 559, 98 S.Ct. 1970, 1978, 56 L.Ed.2d 525 (1978); has approvingly quoted authority equating "probable cause" with "reasonable grounds to believe," *id.* at 556 n.6, 98 S.Ct. 1970; and has even used the phrases "reasonable cause" and "probable cause" interchangeably, *compare id.* at 556, 98 S.Ct. 1970, *with id.* at 557, 98 S.Ct. 1970. *See also Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

■ Appellant's second misunderstanding is his contention that for the warrant to have been proper there had to have been probable cause to believe that he was responsible for the explosion. This would

mean that the search of appellant's home was improper unless the police had sufficient evidence prior to the search to arrest him. Such a requirement would render property searches ineffective as tools of criminal investigations in many cases, and it has been rejected by the Supreme Court. The Court has ruled that " '[o]nce it is established that probable cause exists to believe a federal crime has been committed a warrant may issue for the search of any property which the magistrate has probable cause to believe may be the place of concealment of ['fruits, instrumentalities, or evidence,' see 436 U.S. at 554, 98 S.Ct. 1970,] of the crime.' " *Zurcher v. Stanford Daily,* 436 U.S. at 558, 98 S.Ct. at 1978, *quoting United States v. Manufacturers National Bank,* 536 F.2d 699, 703 (6th Cir. 1976), *cert. denied sub nom. Wingate v. United States,* 429 U.S. 1039, 97 S.Ct. 735, 50 L.Ed.2d 749 (1977). Moreover, the Court has declared that "it is untenable to conclude that property may not be searched unless its occupant is reasonably suspected of crime and is subject to arrest." 436 U.S. at 559, 98 S.Ct. at 1978. It is true that *Zurcher* involved a search of property possessed by a third party who was not suspected of the criminal activity being investigated, and held only that such a nonsuspect's property could be searched without probable cause to arrest him. But, the rule is obviously the same with respect to a person who the police do indeed suspect but do not have probable cause to arrest; such a person's property may be searched upon probable cause to believe that fruits, instrumentalities, or evidence of the crime are present, even though the products of the search may implicate him. *Carroll v. United States,* 267 U.S. 132, 158–59, 45 S.Ct. 280, 69 L.Ed. 543 (1925); 436 U.S. at 556–58, 98 S.Ct. 1970.

■ In this case it is undisputed that the judge who issued the warrant had probable cause to believe that a crime had been committed. Whether he properly issued the warrant therefore depends upon whether he had probable cause to believe that instrumentalities of the crime were present in appellant's home. Appellant claims that such probable cause was lacking because of

insufficient evidence linking him to the bombing and inadequate reason to expect that instrumentalities would be found in his home even if he had been involved.

The evidence described in the affidavit connecting appellant to the explosion was the "unknown male's" statement that a white Cadillac had left the scene moments before the explosion, Patrolman Arnstein's earlier observation of a white Cadillac and a man fitting appellant's description at the tavern, the fact that appellant owned a white Cadillac, which was parked at his home the day after the bombing, and the fact that appellant owned the bombed tavern. Perhaps the most important fact was the statement that the white Cadillac had left the scene "moments" before the explosion. This permitted the issuing judge to conclude that whoever was driving the car heard the explosion but did not return. Since the relative uniqueness of white Cadillacs and the earlier evidence of defendant's presence justify a conclusion that it was defendant who was driving away, the judge could further have drawn the inference of complicity from a failure to do what defendant, if innocent, would have done, i.e., returned to check on his premises after hearing the explosion. If the issuing judge was entitled to credit all of this information, we think it provided him with an adequate foundation to regard appellant as a prime suspect, quite apart from whether it would have provided probable cause for appellant's arrest.

■ Appellant, however, challenges the use of the statement of the "unknown male," a crucial piece of evidence in the chain implicating appellant, in establishing probable cause for the search. Appellant argues that the statement of the "unknown male" should be treated as an informant's tip and not credited because the police have not demonstrated his credibility and the reliability of his statement, as required by *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). *See also United States*

*v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). We do not, however, regard the "unknown male's" statement as an informant's tip subject to *Aguilar* and *Spinelli*. We view it instead as the statement of a bystander witness. While the affidavit does not expressly disclose the source of the "unknown male's" information, the nature of the information he provided and the circumstances of his "on the scene" report could strongly suggest to the issuing judge that he was relating what he had personally observed. And, his statement was not at all in the nature of an informant's tip—it was non-accusatory and did not describe criminal activity. He merely stated that a white Cadillac had left the scene moments before the explosion, a detail innocuous by itself. Its significance lay in its fitting in with other facts which such a bystander would presumably not know. To be sure, it would have been preferable for the affidavit to have identified the "unknown male" and to have specified whether he had personally observed the Cadillac leave the scene. But we must interpret the affidavit "in a commonsense and realistic fashion," eschewing "[a] grudging or negative attitude" and recognizing that affidavits for search warrants "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). From that perspective, the reasonable implication of the affidavit is that the "unknown male" was a bystander witness, not an informant. Treating him as such—and taking into account that the statement, which formed a single link in a circumstantial chain, was non-accusatory—we think the demonstration of credibility and reliability that would be required under *Aguilar* and *Spinelli* in the case of an informant is not required here. As the Second Circuit noted in *United States v. Burke*, 517 F.2d 377, 380 (2d Cir. 1975) (Friendly, J.),

> "there has been a growing recognition that the language in *Aguilar* and *Spinelli* was addressed to the particular problem of professional informers and should not be applied in a wooden fashion to cases

where the information comes from an alleged victim of or witness to a crime." *Accord, e. g., United States v. Bell*, 457 F.2d 1231, 1238–39 (5th Cir. 1972); *United States v. Mahler*, 442 F.2d 1172, 1174–75 (9th Cir.), cert. denied, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971); *United States v. McCoy*, 478 F.2d 176, 179 (10th Cir.), cert. denied, 414 U.S. 828 (1973). The considerations that produced the *Aguilar* and *Spinelli* formulation in the case of an informant do not all apply in the eyewitness situation. *United States v. Bell*, 457 F.2d at 1238–39.

While the precise requirements of *Aguilar* and *Spinelli* need not be met in this situation, it is still necessary that the issuing judge have had a "substantial basis" for crediting the hearsay. *See United States v. Burke*, 517 F.2d at 381. *See generally United States v. Harris*, 403 U.S. at 581, 91 S.Ct. 2075; *Jones v. United States*, 362 U.S. 257, 271–72, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). That the "unknown male" was not identified and that the affidavit did not state the circumstances of his observation might be grounds for discounting the statement had it stood alone. However, we think the corroboration provided by Patrolman Arnstein's observation of a white Cadillac at the tavern earlier in the morning afforded a sound basis for crediting the remark. We accordingly agree with the district court that the affidavit's hearsay report of the "unknown male's" statement could contribute to the probable cause basis of the search warrant. *See Jones v. United States*, 362 U.S. at 271, 80 S.Ct. 725; Fed.R.Crim.P. 41(c).

■ The facts recited in the affidavit thus strongly pointed to appellant as having played some role in the bombing. To justify the warrant authorizing the search of his house, the affidavit must also have provided a reasonable basis to believe that the instrumentalities of the crime sought by the police—wires, blasting caps, dynamite, crimping pliers and other tools applicable to the making of a bomb—might be found there. The affidavit stated in this regard only that the bomb squad officers believed that the type of bomb used at the tavern "would

generally be assembled in a workshop of some sort, as opposed to in the vehicle, because of the type of tools and materials needed to assemble the bomb." Appellant claims that that supposition does not create a reasonable basis for believing that the instrumentalities sought were present in appellant's home.

While the question is a close one, we believe it was permissible for the issuing judge to infer that evidence or instrumentalities might be found in appellant's home. We note particularly the abundance of wire (103 feet outside the tavern), the location of some of it inside the tavern, and the home-made nature of the device. The defendant, who could have been thought to have known precisely when the explosion was to occur, was the only person so far known to have had a possible connection with the bomb. Since a place to assemble it other than a car, or out of doors, was indicated, this would suggest two places—the tavern and defendant's home. While we are urged to accept the tavern as equally probable, we think the tavern a particularly unlikely place for the clandestine assembling of a bomb, given the wide-ranging authority of officers to inspect premises of dealers in liquor with or without warrant, *United States v. Biswell*, 406 U.S. 311, 314, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). This is a business with "a long tradition of close government supervision, of which any person who chooses to enter . . . must already be aware." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313, 98 S.Ct. 1816, 1821, 56 L.Ed.2d 305 (1978). Under these circumstances, defendant's house emerges as the likely location having a connection with him. Furthermore, it was reasonable to assume that if the bomb had been assembled in the house, given the large quantity of wire, the traces of bomb-making activity sought would still be present when the warrant was issued and executed the day after the explosion. Reasonable inferences of this nature are sufficient to justify the search warrant. *See United States v. Samson*, 533 F.2d 721, 723 (1st Cir.), *cert. denied*, 429 U.S. 845, 97 S.Ct. 126, 50 L.Ed.2d 116 (1976); *cf. United States v. Picariello*, 568 F.2d 222, 224–27 (1st Cir. 1978); *Haefeli v. Chernoff*, 526 F.2d 1314, 1318–19 (1st Cir. 1975); *United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970). *But cf. United States v. Flanagan*, 423 F.2d 745 (5th Cir. 1970).

Accordingly, giving due weight to the finding of probable cause by the state judge who issued the warrant in this close case, *see United States v. Ventresca*, 380 U.S. at 109, 85 S.Ct. 741, we think that the warrant had an adequate probable cause basis.

## II.

■ Appellant argues next that Detective Lydstone's affidavit contained material misrepresentations and omissions in reckless disregard for the truth, and that therefore the search warrant should have been voided and the seized firearms excluded from evidence under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In *Franks* the Supreme Court ruled,

"where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

438 U.S. at 155–56, 98 S.Ct. at 2676–77. The district court held an evidentiary hearing on appellant's challenges to the truthfulness of the affidavit and found them to lack merit. We are not persuaded that the court erred.

The veracity challenges appellant makes are to the affidavit's statement that "[u]pon [Patrolman Arnstein's] arrival and during his investigation, an unknown male stated that a white Cadillac had left the scene moments before the explosion." This is all the affidavit said regarding what the witness had reported seeing. Appellant challenges the veracity of this statement in three respects. Appellant first claims that the stated timing of the car's departure, "moments before the explosion," was a material misrepresentation of what the witness had reported. It is true that at the district court's hearing on the motion to suppress, both Arnstein and Lydstone testified that the witness had in fact not stated just when he had seen the car leave. But, both officers consistently maintained that the witness had reported seeing the car in the area just prior to the explosion and seeing it leave at some unspecified point. Since the witness reported this to Arnstein just after the explosion, the inference is clear that the witness saw the car leave either moments before, at the time of, or moments after the explosion. Within this narrow range, it is difficult to discern how the precise timing of the car's departure from the scene of the explosion would have made any difference to the issuing judge's determination of probable cause. The affidavit's inaccuracy, if any, in this regard was therefore immaterial.

Appellant claims further that it was a material omission for the affidavit to identify the witness as an "unknown male." The evidence supports the district court's finding, however, that the only information the police had about the witness at the time the affidavit was submitted was that he was known by the nickname "Arky" and that he was associated with the Circle Cafe, an establishment located close to Rooney's Tavern. While it would have been preferable for Lydstone to have included even this sketchy information in the affidavit to indicate that the witness was not a phantom stranger in the night, its usefulness to the issuing judge seems slight. The district court, in any event, found the information was not excluded intentionally or in reckless disregard for the truth, and we cannot say that the court was clearly erroneous.

Lastly, appellant contends that the affidavit was flawed for not disclosing statements made by "Arky" to Detective Coleman in a telephone conversation the day after the explosion. The conversation evidently took place when Coleman and Lydstone went to the Circle Cafe to inquire about "Arky," and were told he was not there but would talk to them by telephone. Coleman reported that during the conversation "Arky" said he had just been joking when he talked to Patrolman Arnstein the night before and that while he had seen a white car parked behind Rooney's Tavern he could not identify the car's make. "Arky" at the same time told Coleman that he had received threats and that he wanted to forget the whole matter, and Coleman sensed that "Arky" was nervous and upset. Detective Lydstone did not mention this conversation in the affidavit for the warrant. The reason he gave for its exclusion was his view that the conversation was irrelevant. The district court, believing that Lydstone genuinely viewed the conversation as irrelevant, found that the failure of the affidavit to mention it was not a deliberate falsification or a reckless disregard for the truth under *Franks v. Delaware*.[2] That was a permissible conclusion on the record. The apparent reason why Lydstone discounted the statements made by "Arky" to Coleman was that his purported recantation of his statement to Arnstein lacked credibility and reasonably seemed to

---

2. The two challenges to the veracity of the affidavit discussed above were decided by the district court prior to the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The court was guided by our opinion in *United States v. Belculfine*, 508 F.2d 58 (1st Cir. 1974), however, and clearly understood that an affidavit's intentional or reckless false statement, if necessary to the finding of probable cause, would invalidate a search warrant. There is no reason to believe the district court would have reached any different result after *Franks v. Delaware*. See also *United States v. Cruz*, 594 F.2d 268, (1st Cir. 1979).

be prompted by the threats he had been receiving. Coleman inferred that the threats related to "Arky's" role as a witness and understandably concluded that he was upset thereby. We do not approve the affidavit's failure to reveal the conversation; whether "Arky's" recantation was unbelievable was properly for the issuing judge, not the police, to decide. Detective Lydstone should have reported the conversation in his affidavit, and it was negligent for him not to have done so. But his failure was evenhanded, omitting not only the extent to which "Arky" had changed his story but the fact that he had received threats. We therefore again hold that the district court was not clearly erroneous in finding that the police were not so culpable as to warrant relief.

### III.

■ Appellant argues lastly that the sawed-off shotgun and sawed-off carbine seized during the search of his home were the fruits of statements obtained from him by the police in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and therefore should have been excluded from evidence. The statements were elicited during the search pursuant to the warrant. Upon beginning the search, a police officer asked appellant whether any money or firearms were in the house. These apparently are routine questions asked for the purpose of protecting the searching officers from violence or accusations of theft. Appellant answered that he did have firearms in the house. The police officer then asked appellant whether he had a Firearms Identification Card or a license to possess the firearms, and appellant answered that he did not. This conversation took place prior to any *Miranda* warnings being given to appellant.

We need not decide under the circumstances whether these questions constituted a custodial interrogation in which appellant was entitled to *Miranda* warnings. Even if we assume that the warnings were required, there is ample evidence supporting the district court's finding below that the

firearms were not the fruits of appellant's statements but were obtained " 'by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Indeed, the district court found that the discovery of the firearms was "wholly unrelated" to appellant's statements regarding the firearms. Police officers had already started their search of the cellar, where the firearms were discovered, before appellant's statements were made. In their search for the implements used in the bombing, the police officers certainly would have uncovered the firearms regardless of appellant's statements. Appellant evidently did not lead the officers to the weapons, and one of them was found in a duffel bag beneath a workbench. As the firearms were discovered by a means wholly independent of the alleged primary illegality, no purpose underlying the exclusionary rule would be served by suppressing the firearms which were found during the otherwise lawful search. *Virgin Islands v. Gereau*, 502 F.2d 914, 926–28 (3d Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Falley*, 489 F.2d 33, 40–41 (2d Cir. 1973).

Appellant's statements that the weapons were unregistered were not necessary to give the police officers probable cause to seize the weapons once they were discovered. The very nature of the objects—a sawed-off shotgun and a sawed-off carbine—provided probable cause to believe the firearms were contraband. The Second Circuit has explained,

"While it is possible for a person to register and therefore possess legally a sawed-off shotgun or an automatic weapon, it is not a prerequisite for a legal seizure that the officers know at the time of the search that the seized weapons were not registered. *United States v. Story*, 463 F.2d 326, 328 (8th Cir.), cert. denied, 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972); *United States v. Cecil*, 457 F.2d 1178, 1180–81 (8th Cir. 1972); *United States v. Zeidman*, 444 F.2d 1051, 1054 (7th Cir. 1971); *United States v. Ciaccio*, 356 F.Supp. 1373, 1378 (D.Md. 1972).[7]

"As the Ninth Circuit noted in *Porter v. United States*, 335 F.2d 602, 607 (1964), cert. denied, 379 U.S. 983, 85 S.Ct. 695, 13 L.Ed.2d 574 (1965), 'a sawed-off shotgun in private hands is not an intrinsically innocent object. The possession of it is a serious crime, except under extraordinary circumstances.' In 1972, there were less than 15,000 registered sawed-off shotguns in the United States, most of which were registered to governmental agencies for training purposes or to residents of Western states. *United States v. Cecil, supra*, 457 F.2d at 1182 n.1 (Heaney, J., dissenting)."

"[7] As the Eighth Circuit noted in *Cecil*, '[w]e know of no rule which requires an officer to have knowledge of all the elements of the crime when he views an article which reasonably appears to be contraband. A requirement that an officer must know the fact of nonregistration before seizing a contraband firearm would stultify the enforcement of the National Firearms Act.' 457 F.2d at 1180."

*United States v. Canestri*, 518 F.2d 269, 274–75 (2d Cir. 1975). In addition, here the sawed-off shotgun was found concealed in a duffel bag beneath a workbench in appellant's cellar, reinforcing the suspicion that it was illegally possessed. Accordingly, the district court correctly concluded that the firearms were not seized as a "fruit of the poisonous tree."

*Affirmed.*

BOWNES, Circuit Judge (dissenting).

The warrants which were issued for the search of defendant Melvin's home and car were fatally defective in that no adequate showing of probable cause was made. The affidavit upon which the warrants were premised was facially insufficient [1] to meet the fourth amendment's requirement that "no Warrants shall issue, but upon probable cause . . . ."

The facts we are presented with are skimpy indeed. At approximately 2:00 A.M. a man was seen in front of Rooney's Tavern.[2] A white Cadillac was parked outside in front. At 3:55 A.M. an explosion ripped through the tavern. According to the affidavit of a police officer who was not present at the time, an "unknown male" had said that a white Cadillac had left the scene moments before the explosion. James Melvin, defendant, at that time owned a white Cadillac. He was part owner of the tavern and lived in another town Weymouth. Leg wires were found outside the back of the building leading inside, thus suggesting that it had been bombed. Two officers of the bomb squad said they thought the bomb which caused the explosion would generally be made in a workshop of some sort. The patrol officer, when shown a photo of defendant, said that the man he had noticed at 2:00 A.M. bore a "strong resemblance" to the picture of defendant. On the basis of these facts—which were all that were before the justice issuing the warrants—a search warrant for defendant's car and another warrant to search his home were obtained.

Even reading the affidavit, which is reproduced in its entirety in the margin,[3] in the most generous light, *United States v. Ventresca*, 380 U.S. 102, 108–09, 91 S.Ct.

1. I discuss, *infra*, some of the subfacial problems of the affidavit.

2. At the suppression hearing, Officer Arnstein stated that, while he thought Rooney's had only a 1:00 A.M. license, it still appeared to be open at 2:00 A.M. with several people inside.

3. The affidavit is here reproduced in its entirety:

COMMONWEALTH OF MASSACHUSETTS
   Suffolk, ss.         Superior Court
*AFFIDAVIT*
   I, JOHN E. LYDSTONE, a detective in the Boston Police Department, assigned to the Intelligence Division, Vice Control Section, being duly sworn, state:

   (1) That I have been a police officer in the City of Boston for the past ten years and for the last three years assigned to the Intelligence Division, Vice Control Section. During that time as a detective in the Intelligence Division, it has been my assignment in part, *to investigate organized criminal activity* in and around the City of Boston.

   (2) That about 9:30 AM on Thursday, November 18, 1976 I and other officers from the Intelligence Division had occasion to respond to 417 Neponset Avenue, Dorchester, which is Rooney's Tavern, on report that an explosion had taken place tnere. Upon arrival and after conversing with members of the Boston Fire Department Arson Squad who were already on the scene, I notified the Boston Police Emer-

2075 (1965), the affidavit does not support a finding of probable cause necessary to underpin the warrants. Neither the facts therein recited nor the inferences reasonably drawn therefrom supports a finding of a probable cause.

gency Service Unit, Bomb Squad and requested them to conduct an investigation.

(3) Boston Police Sergeant Ruglario and Patrolman Cunningham of the Bomb Squad responded and conducted an investigation and reported the following facts to me: a length of brown wire was found at the rear of Rooney's Tavern, partially concealed in the grass. This wire was about one hundred and three feet in length with the insulation stripped at both ends and extended from the rear of the Tavern to the sidewalk along Cradick Street. It is the opinion of the Bomb Squad officers that this wire is capable of and consistent with the type used to explode a bomb. The officers further reported that inside of the tavern a length of similar brown wire was found. Attached to the end of this wire was a piece of yellow wire and a piece of blue wire which is consistent with the kind used to detonate a blasting cap which would detonate a stick of dynamite. It is the opinion of these bomb squad officers that the above paraphernalia was in facts [sic] used to cause the explosion at Rooney's Tavern.

(4) That at about 6:00 PM on Thursday, November 18, 1976, I and other officers of the Intelligence Division interviewed Patrolman John Arnstein of Boston Police District 11. Patrolman Arnstein stated that at about 2:00 AM on Thursday, November 18, 1976, he had been on duty and patrolling the area of Rooney's Tavern and noted that a white Cadillac was parked at the front door and that a white male, about 35 years, 5–10, 180 lbs. was standing at the front door. Later that same morning, at about 3:56 AM, Patrolman Arnstein responded to a radio call relative to an explosion at Rooney's Tavern. Unon [sic] and during his investigation, an unknown male stated that a white Cadillac had left the scene moments before the explosion.

(5) That I gave photographs of persons known by me to frequent the area of Rooney's Tavern and Patrolman Arnstein indicated that a photograph of James Melvin bore a strong resemblance to the man that he had seen at the Tavern door at 2:00 AM that morning.

(6) That James Melvin is a white male, 34 years old 5′9″ 165 lbs., is listed as an owner of Rooney's Tavern and that he operates a 1976 Cadillac, color white, Mass. Reg. D66–105 and he resides at 38 Ells Ave., Weymouth.

(7) That at about 10:00 PM Thursday, November 18, 1976, Detective Martin Coleman of the Intelligence Division responded to 38 Ells Aven., Weymouth and observed that the white

In its skeletonized form, the information presented in the affidavit[4] was that a white Cadillac and a man who resembled defendant were seen in front of the tavern at 2:00 A.M.,[5] that defendant owned a white Cadillac, and that an "unknown Cadillac belonging to Melvin was parked at that location.

(8) That I have discussed the above stated facts and their inferences with other members of the Intelligence Division and it is our collective opinion that there is probable cause to believe that James F. Melvin was responsible for the explosion at Rooney's Tavern and respectfully request that the Court issue search warrant for Melvin's white Cadillac, Mass. Reg. D66–105.

(9) I have discussed the facts and inferences of this case with Sgt. Ruglario and and [sic] Patrolman Cunningham of the Bomb Squad. They inform me that the type of device capable of causing the above damage (at Rooney's Tavern) would generally be assembled in a workshop of some sort, as opposed to in the vehicle, because of the type of tools and materials needed to assemble the bomb. Therefore, I also request a search warrant for James Melvin's residence at 38 Ells Avenue, Weymouth, Massachusetts. That residence is described as a single-family, brown, two-story house with a garage attached.

Respectfully submitted,
*John E. Lydstone*

___

John E. Lydstone
*Detective*
Boston Police Department

4. There is no contention that information other than that in the affidavit was presented to the justice who issued the warrants. Any finding of probable cause must, therefore, be found in the affidavit. *Spinelli v. United States,* 393 U.S. 410, 413 n.3, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 109 n.1, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Giordenello v. United States,* 357 U.S. 480, 486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

5. This fact in and of itself imputes no wrongdoing. Even if the bar had a closing time of 1:00 A.M., it is not unreasonable that the owner should come to the premises an hour later, perhaps to check receipts for the evening, close the bar for the night, check to make sure that everything had run smoothly. In short, neither the fact, nor any reasonable inference therefrom, that a man strongly resembling defendant had been seen in front of the tavern at 2:00 A.M. is suggestive of criminal liability.

male"[6] had stated that a white Cadillac had left the tavern shortly before the explosion at 3:55 A.M.[7]

To uphold a search of defendant's home on the basis of the affidavit here is a brazen intrusion upon historic fourth amendment rights. A man who resembled defendant was observed entering his own establishment, a car of the same make as that owned by defendant[8] was later observed shortly before the explosion. Two bomb experts concluded that the explosive was probably built in a workshop. In boiled down format, this was the basis upon which the warrant issued. I cannot believe the constitution's requirement for a finding of probable cause can be satisfied on these facts.

There is a disturbing circularity to the majority's argumentation. It proceeds on inferences to find it reasonable to suspect defendant of having bombed the tavern and

then assumes that the tools for the bomb making are likely to be found at his residence. The defendant's white Cadillac, on this bootstrap merry-go-round, becomes the key that opens his home to a search and seizure.

The affidavit contains the assertion that it is the "collective opinion" of the police that there is probable cause to believe defendant was responsible for the explosion. That this conclusory statement could not— at least in my understanding—support an arrest warrant (and I find it interesting that no arrest warrant was ever sought by police despite their collective opinion that there was probable cause) is beyond peradventure. It is, however, the necessary building block in the affidavit's construct since, from this, the affidavit skips to the fact that two members of the bomb squad ventured their opinion that the bomb which caused the explosion would "generally be

---

**6.** The "unknown male" was the owner of a nearby bar and was known to the police at the scene of the explosion as Arky. As Arky was approaching the throng of police, he asked Officer Arnstein, "Am I a prime suspect in this?". His query was made in a joking manner according to his deposition testimony. There is nothing in the record before us to suggest that he was in any way involved in the explosion. I note the remark simply for the tint it casts over the question of his credibility as a witness.

**7.** From these facts, a jump is made that probable cause existed to search defendant's car. The search of defendant's car is not the focus of attention here since the guns which formed the basis of the indictment and conviction were found in the house, not the car. Since, however, the car forms a necessary step on the road to finding probable cause to search the house, I briefly consider it. On the basis of the facts contained in the affidavit, I think that no warrant should have issued for a search of the car. I reach this conclusion recognizing full well that automobiles have been accorded special treatment by the Supreme Court for fourth amendment purposes. An exception to the warrant requirement has been formulated for searches of automobiles under certain circumstances. The rationale has been articulated in terms of the unique status automobiles enjoy in our society, with their inherent mobility and relatively fewer expectations of privacy associated with them. *See, e. g., United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. Martinez-Fuerte,* 428 U.S. 543, 561, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *Cardwell v. Lewis,* 417 U.S. 583,

590, 94 S.Ct. 567, 38 L.Ed.2d 467 (1974) (plurality opinion); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Nonetheless, there is a bedrock upon which any such search must rest: probable cause. "[T]he *Carroll* doctrine does not declare a field day for the police in searching automobiles. Automobile or no automobile, there must be probable cause for the search." *Almeida-Sanchez v. United States,* 413 U.S. 266, 269, 93 S.Ct. 2535, 2537, 37 L.Ed.2d 596 (1973) (footnote omitted). *Cf. Delaware v. Prouse,* —— U.S. ——, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (either probable cause or articulable reasonable suspicion necessary for spot checks of automobiles). Here, there was no information in the affidavit concerning the year of the Cadillac seen at 2:00 A.M. and the one seen later. No license plate numbers were obtained, to check against whether the car purportedly seen at 3:55 A.M. bore tags registered to defendant, no year or model of the Cadillacs was included, matching either the 2:00 A.M. car with the 3:55 A.M. one or matching either vehicle with the one owned by defendant. In short, I find no clearly identifying information linking the cars seen with that owned by defendant.

**8.** I do not believe, as the majority suggests— nor is there anything in the record to support a finding—that white Cadillacs are "relative[ly] unique[ ]" in Boston. In a city the size of Boston, Cadillacs—even white ones—are not an endangered species.

assembled in a workshop of some sort." On this basis—the collective opinion by the police that defendant was responsible and the opinion of two bomb experts that a workshop of some sort might have been used in making the explosive—a warrant to search defendant's home was obtained. This eviscerates the fourth amendment's mandate that no warrant issue except on probable cause.

We are asked to link inference to inference until the final chain of probable cause is forged. The first set of inferences culminated in the conclusion that it was reasonable to assume that defendant had played a role in the bombing. Next, we are told that it was reasonable to believe that the bomb would have been constructed in a workshop of some sort. From there, the inference is that the bomb was a homemade device which the person responsible would have built himself. Since we have already inferred that defendant was probably responsible—so the argument goes—it then becomes reasonable to suspect that he built the bomb and that his home, which lies in another town (though we are assured, is not too distant from the tavern) would have been the locus of the bomb making activity. Finally, we are faced with the linchpin that *if* the bomb had been assembled in the house, the traces of bombmaking would still be present.[9]

I reiterate what this court said on an earlier occasion:

> It is one thing to expect the magistrate to give a commonsense reading to facts set forth and to draw inferences from them. It is quite another thing to expect the magistrate to reach for external facts and to build inference upon inference in order to create a reasonable basis for his belief[.]

*Rosencranz v. United States*, 356 F.2d 310, 317 (1st Cir. 1966).

There must be a "substantial basis" for the magistrate or justice to conclude that evidence of the crime would be found at defendant's home. *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). "Facts or circumstances" from which the justice can find probable cause must be presented. *Nathanson v. United States*, 290 U.S. 41, 47, 54 S.Ct. 11, 78 L.Ed. 159 (1933). Here, no such basis was present. No facts or circumstances were described which would have permitted the justice to conclude that evidence of the bombmaking would likely be found at the home. There was no allegation that more than one bomb was constructed, *compare United States v. Picariello*, 568 F.2d 222, 224–26 (1st Cir. 1978); there was no statement that defendant had a workshop in his home; no one reported seeing any such bomb making implements at the home, *compare United States v. Burke*, 517 F.2d 377, 379 (2d Cir. 1975); no one had personally witnessed defendant making such a bomb, *compare United States v. Harris*, 403 U.S. 573, 579, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); the affidavit claimed no direct knowledge of explosive making material at defendant's home, *compare Jones v. United States*, 362 U.S. 257, 268, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1960).

The cases cited by the government and relied upon by the majority are clearly distinguishable. In *United States v. Samson*, 533 F.2d 721 (1st Cir.), *cert. denied*, 429 U.S. 845, 97 S.Ct. 126, 50 L.Ed.2d 116 (1976), there was a recitation of specific facts by the informant who had been directly involved in the criminal activity; there was no question about defendant's involvement in the purported illegality. The informant also stated that defendant, who had illegally brought guns to the informant's apartment for sale, then brought the guns back

---

**9.** No traces of bombmaking were found in defendant's house, though some evidence was found in the car. Instead, the police uncovered a veritable arsenal of dangerous and highly suspicious weapons and ammunition. Seven guns were seized, including sawed-off weapons. A cache of ammunition, including armor piercing bullets, was taken by the police. The munitions are highly suggestive, of course, of criminal behavior. Their discovery cannot, however, justify *post facto* the illegal search, initiated without probable cause.

to his own apartment as far as the informant knew.

*Haefeli v. Chernoff*, 526 F.2d 1314 (1st Cir. 1975), upheld a warrant to search defendant's apartment following his arrest for possession of stolen property and after other evidence and fruits of criminal activity had been seized from a search of his car. Other known pieces of property which had been stolen during the burglary were still missing. On these grounds, as well as evidence which had been gathered as the result of surveillance and general identification of defendant by other victims, we found the search warrant validly issued.

In *United States v. Lucarz*, 430 F.2d 1051 (9th Cir. 1970), defendant mail clerk had signed for a registered pouch containing $29,000; several hours later, he reported the pouch stolen. Defendant was seen leaving the post office and returning approximately thirty-five minutes later, time enough for him to have gone to his home and returned. Shortly thereafter, he reported the pouch missing. The affidavit contained detailed descriptions of his movements, as well as glaring discrepancies in the story he told his supervisor and others. His own version was internally inconsistent.

*United States v. Picariello, supra*, 568 F.2d 222, is clearly not apposite. There, over 1,200 pounds of explosives had been stolen and only a small portion recovered; defendant had been under surveillance for two months prior to the search, following tentative witness identification of defendant as a participant in a bombing incident. Defendant was observed by agents leaving his house carrying a box and an attache case, entering a car which was tailed by police, then which was engaged in a high speed chase with police, and was found abandoned hours later with fifty sticks of the stolen dynamite in it.

Here, by contrast, we have no eyewitness or participant to the alleged illegality; we have no positive identification of defendant as directly involved in the explosion; there was no valid arrest and simultaneous discovery of part of the incriminating material; there was no showing that defendant had ever possessed explosives; there was no suggestion that more than one bomb had been manufactured; there were no grounds for a reasonable belief that additional explosive making material was extant or would be found at defendant's home.

For a series of cases which have held that no probable cause existed to search defendant's home, even *after* defendant had been lawfully arrested (here, there is not even this to suggest a permissible link for a search of defendant's house), see e. g. *United States v. Gramlich*, 551 F.2d 1359, 1362 (5th Cir. 1977) (no circumstance upon which magistrate could base his determination that incriminating evidence would be found in defendant's home; search invalid); *United States v. Bailey*, 458 F.2d 408 (9th Cir. 1972) (nothing in the affidavits to support affiant's conclusion that fruits of the crime might be in either the house or car; search invalid); *United States v. Flanagan*, 423 F.2d 745 (5th Cir. 1970) (affidavit merely raises the suspicion that goods would be found in the home sought to be searched; search invalid).

The affidavit here presented "no more than an anemic suspicion," *United States v. Whitlow*, 339 F.2d 975, 980 (7th Cir. 1964), that evidence of bomb making would be found at defendant's home. No adequate foundation for a finding of probable cause was laid and the resulting warrant was, therefore, illegally issued.

I am also troubled by the implications of the majority's comments regarding the degree of certitude required for a finding of probable cause. *Ante* at pp. 495–496. The majority states that probable cause is properly defined as reasonable cause and cites to *Zurcher v. Stanford Daily*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 565 (1978), and *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The focus of the discussion in *Zurcher* was whether the premises of a third party, not implicated in criminal wrongdoing, could lawfully be the subject of a search warrant when there was probable cause to believe evidence of a crime could be found there. The majority, by focusing narrowly on lan-

guage relating to "reasonableness," compels the inference that the degree to probity required for probable cause to obtain a search warrant is somehow of a lesser calibre than other forms of probable cause. This is patently incorrect. Probable cause for a search warrant requires the same degree of certitude as probable cause to arrest.[10] *Zurcher* at 556–57 n.6, 98 S.Ct. 1970; *Spinelli v. United States*, 393 U.S. 410, 417 n.5, 89 S.Ct. 584, 21 L.Ed.2d 637; (1969); *Aguilar v. Texas*, 378 U.S. 108, 112 n.3, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Giordenello v. United States*, 357 U.S. 480, 485–86, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958); *Ex parte Burford*, 7 U.S. (3 Cranch) 448, 451, 2 L.Ed. 495 (1806). While that degree need not be calibrated according to mathematical formula, the strong showing which must be made cannot be ignored.

In reviewing the affidavit for probable cause, my brethren analyze the information provided by the "unknown male" and discuss the distinction which has been drawn by some courts between crediting information which comes via an informant and that from a bystander witness. According to the distinction, the latter is not subject to the precise requirements of *Aguilar v. Texas, supra*, 378 U.S. 108, 84 S.Ct. 1509, and *Spinelli v. United States, supra*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637. However, the cases cited by the majority in support of the application of this principle to the instant case do not aid the affidavit here relied on. In *United States v. Burke, supra*, 517 F.2d 377, the eyewitness had actually seen the illegal gun in the place to be searched, there was particularity of detail, and the witness was named. In *United*

*States v. McCoy*, 478 F.2d 176 (10th Cir.), *cert. denied*, 414 U.S. 828, 94 S.Ct. 53, 38 L.Ed.2d 62 (1973), eyewitnesses aboard a skyjacked plane gave detailed information concerning defendant; the F.B.I. laboratory in Washington matched the handwriting on the demand note to defendant's Army personnel records; there were several other corroborating details, all directly linking defendant with the crime. In *United States v. Bell*, 457 F.2d 1231 (5th Cir. 1972), there was positive identification by witnesses of defendant, there were several corroborating witnesses. In *United States v. Mahler*, 442 F.2d 1172 (9th Cir.), *cert. denied*, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971), there was a self-corroborating aspect to the information transmitted since the informant had been the victim of defendant's extortion scheme.

The important point these cases make is that an affidavit does not fail merely because it relies on hearsay evidence of a bystander to establish probable cause. So long as the hearsay evidence includes indicia of credibility and internal reliability, it poses no problem. The problem arises when, in a case such as that presented here, there is no method for ascertaining the truth or accuracy of the bystander's comments. He was listed solely as an unidentified male; there was no statement that he himself had seen the car leave the scene of the explosion;[11] there were no other witnesses who could place the car at the scene moments before the explosion. On this last point, I think it important to say that, unlike my brethren, I do not consider the patrol officer's observation of a white Cad-

---

**10.** Relaxation of this standard has been condoned in a few specifically recognized exceptions, *i. e.*, routine searches which occur at our national borders and their functional equivalents and which involve no more than a visual inspection of occupants and contents visible from the outside, *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); searches of luggage at the border; "stop and frisk" limited searches for weapons under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In these limited cases,

the personal interest protected by the fourth amendment has been weighed against the public interest in the search and the intrusion has been found to be reasonable.

**11.** In fact, we know now that he never said that he had seen the car leave the scene shortly before the explosion. We further know that he was not at the site when the explosion occurred, but had left fifteen to thirty minutes earlier and was at his home and was called by an employee whose house faces Rooney's Tavern. Arky then drove from his house back to the area.

illac two hours earlier as corroborating evidence that a white Cadillac was seen shortly before the explosion. The unidentified male had not seen defendant or anyone else at the tavern, so there was no positive identification unlike the cases cited above. There was no self-corroborating aspect to Arky's comment, since he had been neither the victim nor accomplice of the alleged illegality. In short, there is lacking the type of firm and concrete detail shown in the witnesses' statements in the cases relied on by the government and the majority. I have no quarrel with the principle that the *Aguilar/Spinelli* analysis might need adaptation where the informant is a witness or bystander rather than a professional informer. What I think is necessary, however, is a recognition that the focus should not be on drawing this distinction, but rather on whether the information transmitted is credible and contains sufficient indices of credibility for a neutral magistrate to be able to justifiably rely on it in finding probable cause.

There are other troubling aspects to this case which raise grave questions. The most serious of these concerns the subfacial problems of the affidavit. Since I believe the affidavit failed on its face to make a showing sufficient to find probable cause, I do not reach the questions raised by defendant concerning the subfacial irregularities of the affidavit, but their mere recitation is unsettling: the failure of the police to disclose that the informant Arky (1) recanted on his identification of the car as a "white Cadillac," (2) may never have identified the car as a white Cadillac, (3) never said that he had seen the car leave the scene of the incident "moments before the explosion," (4) was not an "unidentified male" since he was known at least by the nickname Arky and was known to have at least a managerial (in fact he was the owner) interest in a nearby competing bar, the Circle Cafe.[12] The majority excuses these failures by not-

ing that the lapses by the police were "even-handed" since they also failed to report that Arky had purportedly received threatening calls. There might be a balancing of the scales were the recantation weighed against the threats. However, the fact that Arky never said that he saw the car "moments before" the explosion, that he never said that he saw the car leaving the scene, and that he, himself, was not even at the scene at the time of the explosion, tips the scale heavily against a conclusion of even-handedness.

The court below also forgave these flaws, on the grounds that the affidavit was prepared in haste because of "evolving and ambiguous circumstances[.]" Although the talisman of time pressure and haste is invoked, I do not succumb to its spell. The police sought the warrant at 5:30 P.M. on November 19, a full 37½ hours after the explosion. This is not the situation of *United States v. Cruz Pagan*, 537 F.2d 554 (1st Cir. 1976), cited below, where the setting was indeed one of a series of rapid-fire events: a plane landed without authority, a car was observed speeding away from the air field abandoning the aircraft. The errors in the affidavit there were minimal and were based on direct observation by the police. Here, the police waited a day and a half before seeking the warrant, during which time little or no effort was made to flesh out the factual details surrounding the explosion. The police *did* interview Arky, by phone. Notwithstanding this, the affidavit still referred to him as "an unidentified male." Even more alarming is the failure of the police to recount Arky's recantation, during that conversation, of his comments of the previous day. This is not the proper setting for applying the rubric of quickly occurring events as an excuse for slight discrepancies or omissions in an affidavit. Everything that was to happen had already occurred. All that remained was for the police to do proper investigative

---

12. The district court, pursuant to *United States v. Belculfine*, 508 F.2d 58 (1st Cir. 1974), *see also Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), held an evidentiary hearing and determined that suppression would not be required for the asserted flaws in the affidavit, ruling that they did not constitute material omissions or misstatements made either intentionally or recklessly.

work so that they could lay the basis for a neutral justice to conclude that probable cause existed to search defendant's car and home. This, the police did not do. In fact, the only investigative work which was done resulted in a recantation which the police suppressed from the affidavit.

The protection afforded by the fourth amendment stands as an important bulwark for people in a free society. Unreasonable searches, made without probable cause, threaten the very fabric of our democratic system. The search here was executed in the absence of probable cause. I think nothing is clearer in our jurisprudence than that the fruits of that search should be suppressed. I fear that by upholding the constitutionality of the search here, the majority's opinion will be read as an open invitation to issue warrants upon the gossamers of suspicion and conjecture.

I would reverse.