IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 1, 2016

**STATE OF TENNESSEE v. MARVIN JOHNSON**

**Appeal from the Criminal Court for Shelby County**
**No. 14-00135   J. Robert Carter, Jr., Judge**

**No. W2015-00783-CCA-R3-CD  -  Filed May 4, 2016**

The Defendant, Marvin Johnson, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder. *See* T.C.A. § 39-13-202 (2014). The trial court imposed a life sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction, (2) the trial court erred by denying his motion to suppress evidence, (3) the trial court erred by admitting an autopsy photograph of the victim, and (4) the trial court erred by denying his request for transcripts. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Stephen C. Bush, District Public Defender, and  Phyllis Aluko (on appeal) and Jennifer Case (at trial), Assistant Public Defenders, for the appellant, Marvin Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul F. Goodman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the March 2013 shooting death of Anthon Joliff. The victim was shot multiple times while sitting in the driver's seat of his girlfriend's car after returning home from shopping.

## Motion to Suppress Evidence

At the hearing, Shelby County Sheriff's Deputy Michelle Hall testified that on March 14, 2013, she responded to a shots-fired call and that when she arrived at the scene, she found the victim sitting in the driver's seat of a car parked in a residential driveway. She said that the victim's left leg was outside the car and that the victim was turned as though he was attempting to get out of the car. She said that Inez Shelton, the victim's girlfriend, was at the scene and that Ms. Shelton identified a man she knew as "Pig" as the person who shot the victim. Ms. Shelton advised that Pig lived in the neighborhood and had left the scene on foot five minutes before Deputy Hall arrived.

Shelby County Sheriff's Sergeant Glen Ray Essary, Jr., testified that he was the lead detective in the present case and that the Defendant had been apprehended when Sergeant Essary arrived at the scene. He recalled the Defendant was apprehended at the end of the street where the shooting occurred. Sergeant Essary asked, "[I]s there a gun somewhere? Is there a gun out that we can keep some child from getting hurt with?" Sergeant Essary said the Defendant denied knowing anything about a gun. Sergeant Essary said that before transporting the Defendant, Sergeant Essary again attempted to learn whether a gun was located in the neighborhood. The Defendant was removed from the police cruiser, advised of his *Miranda* rights, and presented the advice of rights form. Sergeant Essary said that the Defendant initialed the form reflecting the Defendant had been read his *Miranda* rights and that the Defendant wrote on the form he did not wish to answer any questions. Sergeant Essary said he stopped questioning the Defendant.

Sergeant Essary testified that after the Defendant was transported to the sheriff's office, the Defendant was placed inside an interview room and advised of his *Miranda* rights again. Sergeant Essary said that the Defendant waived his rights and that the Defendant only wanted to know whether "Mr. T" was dead. Sergeant Essary noted that the victim's nicknames were Tony and Mr. T. Sergeant Essary said the Defendant did not admit involvement in the killing.[1]

Sergeant Essary testified that after the Defendant's arrest, Sergeant Essary requested recordings of the Defendant's telephone calls while in the jail. Sergeant Essary reviewed the jail telephone calls and said that in one conversation between the Defendant and his mother, the Defendant admitted shooting the victim but claimed the shooting was self-defense. Sergeant Essary said that he participated in a search of the Defendant's mother's home after she provided Detective Whitaker written consent.

---

[1] The Shelby County Sheriff's Office recorded the interview. The prosecutor, though, told the trial court and trial counsel that he did not intend to use the recording during the State's case-in-chief and that he only intended to use the recording for impeachment purposes.

On cross-examination, Sergeant Essary testified that although he did not go to the Defendant's home located on the same street where the shooting occurred, other deputies went to the home. He agreed that when he arrived at the scene, the Defendant was being detained, was wearing handcuffs, and was not free to leave. He said that although he did not recall when the Defendant was apprehended, he knew it was dark outside and before midnight. He said the Defendant was placed in custody based upon Ms. Shelton's statement to deputies. Sergeant Essary said that the Defendant had not yet been formally charged with the homicide when the Defendant arrived at the sheriff's office because the charges had to be approved by the District Attorney's Office. He agreed the District Attorney's Office was not contacted until after the Defendant's and Ms. Shelton's formal police interviews. He said the charges were approved between 4:00 and 5:00 a.m. on March 15, 2013.

Sergeant Essary testified that the Defendant's police interview began on March 15, 2013, at around 1:00 a.m., and that the interview lasted thirty minutes. Relative to Ms. Shelton's interview, Sergeant Essary said she identified the Defendant from a photograph lineup as the person who shot the victim. Sergeant Essary said the Defendant was placed under arrest at 4:45 a.m. and was placed in the jail at 6:57 a.m. He said that although the Defendant's arrest ticket reflected the arrest was pursuant to a warrant, the Defendant was arrested without a warrant. Sergeant Essary later clarified that an arrest warrant was ultimately obtained.

Shelby County Sheriff's Detective Arby Whitaker testified that he responded to the scene to assist other deputies and that Charlotte Tuggle, a female passerby, told him that a man ran into a house on a nearby street. Detective Whitaker said that Ms. Tuggle described the house and that he relayed the information to Patrol Officers Sturgen and Brown at the scene.

On cross-examination, Detective Whitaker testified that Ms. Tuggle did not report seeing anyone flee from the scene. He did not recall whether Ms. Tuggle described the person she saw but said his report would reflect whether she provided a description.

Marquita Johnson, the Defendant's sister, testified that in March 2013, she, her two daughters, her sister, her sister's son, her mother, and the Defendant lived in a home down the street from where the shooting occurred. Ms. Johnson said the Defendant had his own bedroom. She said that on the night of the shooting, she saw three flashlights outside the home around 8:00 p.m. She said that three sheriff's deputies knocked on the door, that her mother opened the door, that the deputies were holding their firearms, and that one of the deputies said, "[L]et us in we know he's in there." When asked if the deputies requested

permission to enter the home, Ms. Johnson said, "I don't recall permission." She said the deputies did not request permission to look around the home.

Ms. Johnson testified that she and her family were instructed to sit on the sofa in the living room. She said that her mother shook and that the three young children cried while the deputies "looked in each room." Ms. Johnson said that the deputies returned to the living room and that one deputy said, "[T]hey were going to get a warrant to search the [Defendant's] bedroom." She said that the deputies asked her mother for permission to search the Defendant's bedroom and that her mother responded, "[Y]es, sir." Ms. Johnson said two deputies left and returned with a search warrant.

On cross-examination, Ms. Johnson testified that the children were ages five, three, and one. She said that her mother gave the deputies permission to search the Defendant's bedroom after the deputies had entered and "looked in" the Defendant's bedroom. Ms. Johnson agreed her mother consented to a search before the deputies returned with the search warrant. On redirect examination, Ms. Johnson stated that she never saw a search warrant.

Jacquelyn Perry, records custodian for the general sessions and criminal courts clerk's office, testified that on March 18, 2013, the Defendant was advised of the first degree murder charge at the video arraignment. On cross-examination, Ms. Perry stated that the Defendant was arrested on March 15, at 12:24 a.m.

Shelby County Sheriff's Detective Robert Brown testified that he responded to the scene of the shooting, that he learned the victim had died, and that he and two deputies secured the scene. He said he and the two deputies began searching for the Defendant after the victim's girlfriend described the shooter and provided the direction in which the shooter fled on foot with the gun. Detective Brown noted that the victim's girlfriend identified the shooter as a man she knew as Pig.

Detective Brown testified that he spoke to several neighbors, one of whom identified Pig's first name as Marvin and the home in which Marvin lived. Detective Brown said that he and two deputies walked to the home and spoke with the homeowner, who was the Defendant's mother. Detective Brown said the Defendant's mother said her son's name was Marvin but was known as Pig. Detective Brown said that although the Defendant's mother denied knowing the Defendant's whereabouts, Detective Brown requested her permission to search the home. He said that the Defendant's mother was "extremely cooperative," that she identified the Defendant's bedroom, and that he looked throughout the home but did not find the Defendant. Detective Brown said that when he looked inside the Defendant's bedroom, he saw pills in prescription bottles and baggies. He noted some pills strewn about the

bedroom.  He said that the narcotics division was contacted regarding the pills, that he left, and that the two deputies remained at the home until a search warrant was obtained.

Detective Brown testified that he continued searching for the Defendant with Deputy Gaither and that Detective Whitaker reported a witness saw a person who matched the description provided by the victim's girlfriend enter a nearby house.  Detective Brown said Detective Whitaker provided a description of the home and the address, but the house described had a different number.  Detective Brown said that he and Deputy Gaither decided to approach the home matching the witness's description.  Detective Brown said that Deputies Sturgen and Shepard arrived at the home and knocked on the side door.  Detective Brown said that the homeowner answered the door and spoke to the deputies and that Deputy Sturgen began shouting commands for someone to show his or her hands and to get down on the ground.  Detective Brown said that the Defendant was standing just inside the home, that the Defendant was taken into custody, and that the Defendant was led out of the home.

Detective Brown testified that he spoke to the Defendant after the Defendant was handcuffed.  Detective Brown said he told the Defendant, "Marvin, I'll be nice to you as you are to me. . . . [W]e need some questions answered.  And for my safety, I need to know what all you have on you.  So I'm going to just get your belongings out of your pockets, okay?"  Detective Brown said that the Defendant understood and that he removed the Defendant's belongings, which consisted of a wallet, a Bible, and a couple of miscellaneous items.  Detective Brown said a weapon was not found.  Detective Brown said the Defendant stated that he did not have a gun, that the gun belonged to the victim, and that he shot the victim after the victim pointed the gun at him.  Detective Brown asked the Defendant where the gun was located, and the Defendant said it was near the victim.  Detective Brown said he asked the Defendant not to speak anymore because the detectives wanted to speak to the Defendant.  Detective Brown said he had not read the Defendant his *Miranda* rights because he had not questioned the Defendant.

On cross-examination, Detective Brown testified that he was carrying a rifle and that the two deputies with him were carrying police-issued semi-automatic pistols.  He said that they used their flashlights when approaching the Defendant's mother's house to ensure nobody was hiding in the vicinity.  He said they went to the home as a result of the victim's girlfriend's statement to police officers.  He agreed no witnesses reported seeing the shooter enter the Defendant's home.  He said that the Defendant's mother was cooperative, told the deputies to come inside, denied the Defendant was home, and told the deputies to look around to ensure the Defendant was not there.  He agreed he did not obtain written consent to search the home.

Detective Brown testified that he requested the people inside the home to sit on the sofa while he and the other deputies confirmed whether the Defendant was there. He denied ordering them to sit on the sofa. He said they had a choice and could have told him and the other deputies that they could not enter the home. Detective Brown denied that he entered the home with his firearm raised when the Defendant's mother opened the door. He said no firearms were pointed at the Defendant's family members. Detective Brown said that he obtained oral consent to enter the home and that his rifle was pointed downward.

Detective Brown testified that Deputy Christian entered the Defendant's bedroom and that Deputy Hill may have entered the room, as well. Detective Brown said that once he saw the drug-related items, he and the deputies stepped out of the room and contacted the narcotics division.

Detective Brown testified that the Defendant was under arrest and not free to leave after the Defendant was placed in handcuffs. Detective Brown agreed that at the time of the arrest, no arrest warrant existed and the Defendant had not been charged with a crime. Relative to the Defendant's statement regarding the gun, Detective Brown said that he did not complete a written report but relayed the Defendant's statement to Sergeant Essary.

Shelby County Sheriff's Detective Jason Valentine testified that he responded to the scene and that he assisted the narcotics detectives at the Defendant's home. He said that by the time he arrived, the narcotics detectives had obtained the search warrant and searched the Defendant's home. Detective Valentine recalled that the seized evidence included ammunition and controlled substances. Relative to the ammunition, Detective Valentine said the detectives found one .380-caliber live round and thirty-six .32-caliber live rounds. On cross-examination, Detective Valentine testified that he never entered the Defendant's home.

Shelby County Sheriff's Detective James Stroud testified that he worked in the narcotics division and that on the night of the killing he received a telephone call from Lieutenant Kevin Helms requesting Detective Stroud attempt to obtain a search warrant for the Defendant's home based upon information learned during the homicide investigation. Detective Stroud said he prepared the warrant, which was granted by a judicial commissioner. He recalled marijuana, cocaine, acetaminophen, and digital scales were found during the search.

On cross-examination, Detective Stroud testified that he did not investigate the scene before obtaining the search warrant and that he relied upon the information provided by Lieutenant Helms. Detective Stroud said Lieutenant Helms told him that detectives spoke with witnesses who identified the Defendant fleeing from the scene of the shooting to the Defendant's home down the street. Detective Stroud said Lieutenant Helms also stated that

detectives conducted a knock-and-talk encounter at the Defendant's home and spoke to the Defendant's mother, who consented to a search of the home. Detective Stroud said he did not think it was necessary for him to investigate further before obtaining the warrant.

Detective Stroud testified that the judicial commissioner who signed the search warrant did not ask questions before granting the request for the warrant. Detective Stroud said that he provided Ms. Robinson a copy of the warrant when he arrived at the home. He said he only participated in the search outside the home.

Shelby County Sheriff's Detective Brian Jones testified that he participated in the search of the Defendant's home. He said that inside a bedroom he found one .380-caliber unfired bullet on a bed under a comforter. He said that the mattress was cut and that inside the mattress, he found a box of .32-caliber unfired bullets. He agreed the return on the search warrant did not reference the bullets but said he gave the bullets to Detective Valentine.

On cross-examination, Detective Jones testified that he responded to the home after the narcotics division was contacted regarding the need for a search warrant. He said approximately four or five detectives responded to the home. He said all the detectives were armed but said his .40-caliber pistol was holstered. He did not recall any children or residents being present during the search.

**Trial Proceedings**

At the trial, Marvay Mosley, the victim's sister, testified that she did not know the Defendant before the March 14, 2013 shooting. She said she had never heard of a disagreement or bad feelings between the victim and the Defendant. She said the victim was age forty-nine at the time of the shooting. She identified a photograph of the victim taken at the time of the autopsy, which was received as an exhibit.

Inez Shelton, the victim's girlfriend, testified that she and the victim lived together at the home where the shooting occurred. She said that on the night of the shooting, she and the victim returned home after shopping. She said that the victim was driving her car, that the victim told her to disengage the home's security system, and that the victim said he would carry the shopping bags inside the home. Ms. Shelton said that as she disengaged the alarm, she heard gunshots and saw the Defendant, who she knew as Pig, in the driveway. She thought she heard two, possibly three gunshots. She said the victim was still sitting in the driver's seat of her car. She said that on the night of the shooting, the deputies who responded to the scene showed her a photograph lineup and that she identified the Defendant as the person who shot the victim. She agreed she did not know the Defendant's legal name at the time of the shooting and only knew him as Pig.

Ms. Shelton testified that one week before the shooting, the Defendant came to her home to talk to the victim. Although she did not know what transpired between the men, she knew there were "bad feelings" between them. She said that she did not work on the day of the shooting but that she left home for a period of time. She did not know if the Defendant came to her home while she was gone.

On cross-examination, Ms. Shelton testified that the road on which she lived did not have streetlights, although she had a light installed on the pole near her backyard when she bought the home in 1995. She agreed the road where the Defendant was apprehended also did not have streetlights. She said that she knew some of her neighbors but that she did not know Alex Chamness or Brandon Tapley.

Ms. Shelton testified that the Defendant attended high school with her daughter. She agreed that on one occasion, the Defendant came to her home looking for someone to drive him somewhere and that the Defendant sometimes visited her home. She said that although the Defendant talked to the victim when the Defendant visited her home, she and the Defendant primarily spoke.

Ms. Shelton testified that the victim had lived at her home for about six months at the time of the shooting and that the victim was not employed while he lived with her. She said the victim's car was not operational, which is why she and the victim used her car. She agreed she had two guns inside her home, which included a .22-caliber Beretta semi-automatic pistol. A photograph of Ms. Shelton's .22-caliber pistol was received as an exhibit. She did not recall testifying at the preliminary hearing that she did not own a firearm and noted she told the deputies on the night of the shooting that she owned a firearm and where to find it inside her home. She said that at the time of her preliminary hearing testimony, law enforcement had possession of the firearm.

Ms. Shelton testified that the victim also owned a firearm and that she told the officers on the night of the shooting that the victim's firearm was "long and ugly." She did not recall testifying at the preliminary hearing that the victim did not own a firearm. After listening to the audio recording of the preliminary hearing, she agreed she was asked, "Does [the victim] have a weapon?" She agreed the victim owned a firearm and said that at the time of the hearing, her mind was "boggled with what had happened" and that she assumed the question was related to whether the victim possessed his firearm at the time of the shooting.

Ms. Shelton testified that on the day of the shooting, she went shopping with her sister, that the victim stayed home without a car, and that Ms. Shelton returned home around 5:00 or 6:00 p.m. She said that she did not recall seeing the Defendant standing in her driveway when she got out of her car. She said that when she returned home and got out of

her car, someone was standing at the end of her driveway but that she did not notice the person's identity because she was in a hurry to use the restroom. She conceded the person might have been the Defendant. After reviewing the recording of her statement to the deputies on the night of the shooting, she agreed the Defendant had been the person standing at the end of her driveway. She said the victim was sitting on the sofa when she entered her home. She identified a photograph of her bedroom and a red shirt lying on the bed. She did not know whether the shirt belonged to the victim.

Ms. Shelton testified that after she returned home from shopping with her sister, she entered the home and walked to the restroom. She agreed that she was in the restroom for a little while and that she did not see the victim when she left the restroom. She said that she walked onto the patio and that about fifteen to thirty minutes later, she and the victim left the home to purchase cups. She said that they returned after stopping at a couple of stores. She said that it was daylight when they left but dark when they returned home. She agreed that she and the victim were gone about forty-five to fifty minutes and that the motion-sensor flood light came on when they returned home.

Ms. Shelton testified that she did not hear a voice as she unlocked the door and that she was inside her home when she heard gunshots. She did not recall telling deputies that she heard a gunshot while she was unlocking the door. She said that she heard the first gunshot immediately after she disengaged the security alarm, that she looked outside, and that she saw the driver's side door open and the Defendant standing beside the driver's side door.

Ms. Shelton testified that the 9-1-1 operator told her to attempt to move the victim out of the car but that she was unable to move him. She said that she consented to a search of her home but that she went to the sheriff's office while the officers searched it. Although she agreed she told the officers to look in her bedroom for her firearm, she said she did not know where the victim kept his firearm. She said she last saw the victim's firearm on her bedroom dresser about one week before the shooting.

Shelby County Sheriff's Detective C.R. Brown testified consistently with his suppression hearing testimony relative to his involvement in the present case. On cross-examination, he agreed the Defendant did not possess a firearm when apprehended.

Shelby County Sheriff's Sergeant Jason Valentine testified that when he arrived at the scene of the shooting, he assisted Sergeant Butterick in taking photographs and collecting evidence. He identified photographs of two fired cartridge casings found on the rear right passenger seat, a single fired cartridge casing found on the front driver's seat, a single fired cartridge casing found on the rear passenger-side floorboard, and a spent projectile on the

rear driver's side floorboard. He identified photographs showing bloodstains on the driver's seat. He said he found the victim's personal property inside the car.

Sergeant Valentine testified that after the car was taken to the sheriff's office, he continued processing it the day after the shooting and that he found seven live rounds of Winchester .38-caliber ammunition in a plastic bag. He thought the bullets were found in the center console.

On cross-examination, Sergeant Valentine testified that the neighborhood was dark because the area did not have streetlights and that the only light was from the ambient lighting from the homes and vehicles in the area. He identified a photograph of two plastic bags sitting on the front passenger-seat floorboard. He said that one bag contained two bottles of beer.

Shelby County Sheriff's Sergeant Essary testified that he interviewed Ms. Shelton at the sheriff's office and that Ms. Shelton stated she heard a gunshot while attempting to unlock the door. He said the Defendant was age twenty-three at the time of the killing and that the Defendant was arrested on March 15, 2013, at 4:45 a.m., although the Defendant was in custody before midnight.

Shelby County Sheriff's Detective James Stroud testified similarly with his suppression hearing testimony regarding his obtaining a search warrant for the Defendant's home.

Shelby County Sheriff's Detective Brian Jones testified that he participated in the search of the Defendant's bedroom. Detective Jones provided testimony similar to his suppression hearing testimony regarding his finding an unfired .380-caliber bullet.

Tennessee Bureau of Investigation (TBI) Special Agent Eric Warren, an expert in firearms identification, testified that he analyzed a Lorcin Model L .380-caliber pistol, two magazine clips, several live cartridges, four fired bullets, and four cartridge casings. He concluded the firearm submitted for analysis did not fire the bullets and cartridge casings recovered from the scene. Relative to the cartridge casings, Mr. Warren concluded that the casings were fired from the same firearm and that the casings showed characteristics consistent with firearm manufacturer Magtech, or CBC. He said the casings displayed CBC, the manufacturer's initials, and +P, reflecting additional gunpowder inside the casing. Relative to the fired bullets, Mr. Warren concluded that the bullets were also consistent with Magtech ammunition. He said that generally, a cartridge casing ejected outward and to the right of a firearm.

On cross-examination, Mr. Warren testified that cartridge casing ejection depended on how the firearm was held, the angle at which a firearm was fired, and additional factors. He said that too many factors existed to conclude where a cartridge casing would travel upon ejection.

Shelby County Sheriff's Homeland Security Officer Juaquatta Harris testified that she received a request from investigating officers for a compilation of telephone calls the Defendant made while in confinement. A partial recording of a telephone call placed on March 15, 2013, was played for the jury. In the recording, a woman asked the Defendant if he shot someone. The Defendant replied," [Y]eah, but in . . . self-defense though. He chased me twice with his (indiscernible) and shot with his gun."

On cross-examination, Officer Harris testified that the portion of the telephone call played for the jury was placed by the Defendant. Officer Harris said that the Defendant identified himself as Pig in the recording and noted that inmates were advised before placing a telephone call that the conversations were subject to monitoring and recording.

Dr. Erica Curry, an expert is forensic pathology, testified that she performed the victim's autopsy and that the victim suffered four gunshot wounds. The first gunshot wound reflected that a bullet entered the body at the left-rib area, traveled through the left lung, struck a major vein of the heart, traveled through the right lung, struck a right rib, and lodged in the right shoulder. She noted no stippling or soot was found. A second gunshot wound was found just below the first entry wound on the victim's left-rib area. The wound reflected that the bullet traveled through a rear left rib and exited through the victim's back. A third gunshot wound was found on the victim's right shoulder. The wound reflected that the bullet traveled downward into the right upper arm where the bullet was recovered during the autopsy. Dr. Curry found soot or stippling on the victim's rear right forearm. A fourth gunshot wound was found on the victim's left elbow. The wound reflected that the bullet traveled through the left humerus, struck the radius, and fractured two bones. Dr. Curry concluded that the cause of death was multiple gunshot wounds.

On cross-examination, Dr. Curry testified that the victim measured five feet, eight inches tall and weighed 168 pounds. Dr. Curry agreed her examination showed that the bullets entering the victim's torso traveled upward, that the bullet entering the arm traveled left to right, and that the bullet entering the elbow traveled back to front.

Shelby County Sheriff's Detective Valentine testified similarly with his suppression hearing testimony regarding the ammunition found during the search of the Defendant's home. He agreed he did not search Ms. Shelton or her belongings and said he did not know if any deputy searched Ms. Shelton.

Alexander Chamness testified for the defense that although he grew up one street from where the shooting occurred, at the time of the shooting, he lived down the street from where the victim died. Mr. Chamness said he had known Brandon Tapley since he and Mr. Tapley were children. Mr. Chamness knew the Defendant and said they had been neighbors for about ten years.

Mr. Chamness testified that on the day of the shooting, he and Mr. Tapley began working on Mr. Chamness's truck outside his home around 6:00 p.m. He said that he saw the Defendant running down the street toward the Defendant's home and being chased by an older man. Mr. Chamness said the man had his hand on a firearm that was tucked into the man's belt. Mr. Chamness said that although he did not understand the Defendant, the Defendant was yelling and appeared distressed. Mr. Chamness described the older man as having "long hair sort of like a Fro" and recalled the man wore a red tank top and pants.

Mr. Chamness testified that as the Defendant and the man ran down the street, Mr. Chamness and Mr. Tapley told the Defendant to enter Mr. Chamness's garage. Mr. Chamness said that the Defendant entered the garage and that the man stood and kneeled behind a car parked along the street for about thirty minutes. Mr. Chamness said that Mr. Tapley spoke to the man. Mr. Chamness said the Defendant looked afraid and upset. Mr. Chamness said the man returned to his home down the street and recalled the Defendant walked toward the Defendant's home. Mr. Chamness testified that he spoke to deputies about what occurred. He said that from his driveway, he could see the Defendant's home and the home at which the man was staying.

On cross-examination, Mr. Chamness testified that he did not witness the shooting. He did not recall telling deputies that he saw the man standing behind the car for about one minute before returning to the home from which he came. Mr. Chamness agreed that he and Mr. Tapley had discussed the incident and that Mr. Tapley reported to the deputies that the man stood behind the car for about thirty minutes.

On redirect examination, Mr. Chamness testified that generally, when he said someone did something for a minute, he did not mean sixty seconds. He recalled the man kneeling behind the car for twenty to thirty minutes.

Brandon Tapley testified that although he lived on a nearby street, he spent much of his childhood on the street where the shooting occurred. He spent time at Donnie Brown's home, which was located at the end of the street where the shooting occurred, and at Mr. Chamness's home. Mr. Tapley had known the Defendant for years from the neighborhood.

Mr. Tapley testified that at 5:30 or 6:00 p.m. on day of the shooting, he and Mr. Chamness were outside Mr. Chamness's home working on Mr. Chamness's truck. Mr. Tapley said that he saw the Defendant's running down the street and being chased by a man, who was holding a gun in his belt, was yelling, and was threatening to shoot the Defendant. Mr. Tapley said the firearm looked like a semi-automatic. He said the Defendant called Mr. Tapley's name while running down the street. Mr. Tapley said he and Mr. Chamness told the Defendant to get inside Mr. Chamness's garage and told the man to leave the area. Mr. Tapley said he told the man that "we didn't want none of that around here," that children were inside the home, and that the man was going to have to do "this another day." Mr. Tapley recalled that his and Mr. Chamness's children were inside the home. Mr. Tapley thought the man wore a tank top and blue pants but could not recall the color of the tank top. He said the Defendant did not have a gun.

Mr. Tapley testified that the man sat down at the rear of a car parked across the street for about forty-five minutes and left. Mr. Tapley said that the man walked to a home down the street and that the man and the woman who lived at the home got in a car and drove away. Mr. Tapley recalled it was daylight but beginning to get dark when the car drove away. Mr. Tapley said the Defendant was terrified.

Mr. Tapley testified that he did not call the police because he did not think it was necessary. He said that "things" had happened in the neighborhood previously and that he thought the Defendant and the man would "settle everything" the next day. Mr. Tapley did not think anything would happen after the man left and said the man never displayed a gun to suggest he would return.

On cross-examination, Mr. Tapley testified that he initially told deputies that the Defendant stayed inside the garage between ten and fifteen minutes, not forty-five minutes. He said, though, the man may have remained behind the car for less than forty-five minutes. Mr. Tapley agreed the shooting occurred after sunset and said he did not know how much time passed between the Defendant's leaving the garage and the shooting. On redirect examination, Mr. Tapley testified that although he did not hear gunshots, he heard a woman scream.

Ms. Shelton's statement to deputies was audio recorded. Two segments of the interview were played for the jury. In the first segment, Ms. Shelton said that she and the victim returned from shopping, that the victim drove the car into the driveway, that the victim told her to unlock the door and he would carry the shopping bags inside the home, that she got out of the car and walked to the door, and that she heard a voice and gunshots. Ms. Shelton stated that she saw Pig standing at the driver's side door and shooting a gun. Ms. Shelton said that she screamed and attempted to get inside the home and that the Defendant

ran away. In the second segment, Ms. Shelton stated that she could not hear what the Defendant said because he was soft spoken.

Upon this evidence, the Defendant was convicted of first degree premeditated murder and sentenced to life imprisonment. This appeal followed.

## I  Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction. He argues the State failed to establish that he was sufficiently free from excitement and passion to be capable of premeditation and that he did not act in self-defense. The State responds that the evidence sufficiently established that the Defendant intentionally killed the victim with premeditation and that the Defendant did not act in self-defense. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)*; see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1) (2014). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d) (2014). "The element of premeditation is a question for the

jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Our supreme court has provided a list of factors which "tend to support the existence" of premeditation and deliberation. *See Bland*, 958 S.W.2d at 660. The list includes the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Id*. (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1997)).

The record reflects that around 5:30 or 6:00 p.m. on the day of the shooting, Mr. Chamness and Mr. Tapley saw the Defendant running down the street and being chased by the victim, who was carrying a firearm in his belt. Mr. Tapley and Mr. Chamness allowed the Defendant to enter Mr. Chamness's garage to end the pursuit. The victim, however, remained in the area between thirty and forty-five minutes. After the victim returned to Ms. Shelton's home, the Defendant left Ms. Chamness's garage and walked toward the Defendant's home. Ms. Shelton arrived home sometime after the victim returned. Ms. Shelton stated that when she arrived home between 5:00 and 6:00 p.m., she walked to the bathroom, stayed inside the bathroom for "a little while," and walked onto the outside patio. She said that she and the victim left the home about fifteen to thirty minutes later. She recalled it was daylight outside when they left and said they stopped at a couple of stores before returning home. She said that they were gone about forty-five to fifty minutes and that it was dark outside when they returned. Ms. Shelton recalled that she got out of the car to disengage the security alarm and that the victim stayed behind to gather the shopping bags. Before the victim could get out of the car, the Defendant shot the victim four times. Ms. Shelton told deputies on the night of the shooting that she heard the Defendant's voice and gunshots before she unlocked the door.

We conclude that this evidence is sufficient to support the Defendant's conviction for first degree premeditated murder. The evidence reflects that once the Defendant took refuge in Mr. Chamness's garage, the victim stayed in the area approximately thirty to forty-five minutes before returning home. Ms. Shelton returned home near the time the victim returned after chasing the Defendant. Ms. Shelton and the victim were at the home fifteen to thirty minutes before leaving and were gone forty-five to fifty minutes. Upon arriving home, the Defendant appeared without warning and before Ms. Shelton could unlock the door and disengage the security alarm. We note that Mr. Tapley's testimony reflects the Defendant did not possess a firearm when the Defendant took refuge in Mr. Chamness's garage but that the Defendant obtained a firearm before the shooting and disposed of it afterward. The victim

was unarmed at the time of the shooting. Furthermore, Ms. Shelton stated during her formal police interview that she could not hear what the Defendant said at the time of the shooting because he was soft spoken. A jury could have reasonably determined from this evidence that sufficient time had passed between the initial altercation and the shooting in order for the Defendant to have acted after reflection and judgment and that the Defendant acted with premeditation, not with excitement and passion.

Likewise, the evidence does not support a finding that the Defendant killed the victim in self-defense. *See* T.C.A. § 39-11-611(b)(2)(A)-(C) (2014). The evidence does not reflect that a reasonable person could have believed the victim's attempting to gather shopping bags and exit Mr. Shelton's car posed an imminent danger of death or serious bodily injury. After the initial altercation had ended, the victim returned to Ms. Shelton's home, and the Defendant left Mr. Chamness's garage walking in the opposite direction as the victim. The victim was unarmed at the time of the shooting, and no evidence reflects that the victim knew the Defendant would suddenly appear in the driveway. We note that the Defendant had no legal right to be on Ms. Shelton's property at the time of the shooting and that the Defendant lived on the opposite end of the road from where the shooting occurred. As a result, the jury could have reasonably determined that the Defendant was waiting in the dark for the victim and Ms. Shelton to return because the Defendant appeared quickly without warning and shot the victim before Ms. Shelton could unlock the door. Likewise, the Defendant ran from the scene, disposed of the firearm used to kill the victim, and did not return home. The jury properly rejected the Defendant's claim of self-defense. The Defendant is not entitled to relief on this basis.

## II    Suppression

The Defendant contends that the trial court erred by denying his motion to suppress evidence seized at his home and his statement during a jail telephone call. He argues that the initial warrantless search of his bedroom was conducted without valid consent or alternatively, that Ms. Robinson exceeded her authority when she consented to a search of the Defendant's bedroom. He also argues that the unlawful initial warrantless search tainted the constitutionality of the search warrant, that the search warrant was defective because it was based upon "deliberately or recklessly untruthful allegations," and that the search warrant was defective because the return failed to mention the seized bullet. Lastly, the Defendant argues that the portion of a recorded jail telephone call played for the jury should have been suppressed because the Defendant was being unconstitutionally detained, because he was not permitted to be present during the judicial commissioner's probable cause determination, and because Tennessee Rule of Criminal Procedure 5(a) was violated. The State responds that the trial court properly denied the motion to suppress.

-16-

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

## A. Warrantless Search and Search Pursuant to a Warrant

Relative to the Defendant's argument that the initial warrantless search was unlawful and tainted the constitutionality of the search warrant, the trial court found that witnesses told the deputies that a man known as Pig was responsible for the shooting and that Pig fled from the scene on foot. The court found that witnesses identified Pig as Marvin and told the deputies where Marvin lived. The court found that Detective Brown knocked on the door of the home, and the homeowner, Ms. Robinson, confirmed that her son Marvin, who was known as Pig, lived there but was not home. The court found that Ms. Robinson allowed the deputies to "to have a look in order to confirm" the Defendant was not home and that Detective Brown described Ms. Robinson as "cooperative and agreeable to the brief search." The court found that the deputies asked for and received limited consent to look inside the home for the Defendant and that it was during the cursory search the deputies observed unlawful contraband. The court found that Detective Brown stopped the search, left two deputies to protect the scene, and contacted the narcotics division for assistance with obtaining a search warrant.

The trial court found that narcotics deputies obtained and executed a search warrant at the Defendant's home. The court found that inside the bedroom identified as the Defendant's, deputies seized suspected cocaine, marijuana, prescription medication, digital scales, one unfired .380-caliber bullet, and a box of .32-caliber bullets. The court found that the search warrant was obtained by Detective Stroud, who obtained the warrant based upon information provided to him by other deputies at the scene. The court noted that Detective Stroud did not drive to the scene to verify the information presented to him.

The trial court noted the Defendant's argument that the phrase in the warrant affidavit "fleeing from the scene of the homicide to his residence" was false because the Defendant was not inside the home when the deputies arrived. The court found, though, that the Defendant could have gone to the residence and left quickly. The court refused to find that the statement was "false or recklessly made" and found that the information contained in the affidavit was sufficient for the magistrate to conclude that evidence of controlled substance violations were occurring at the time of the issuance of the warrant. The court found that the search warrant was valid and that the single .380-caliber bullet was lawfully discovered and seized pursuant to the warrant.

Our federal and Tennessee constitutions prohibit unreasonable searches and seizures and provide generally that warrantless searches and seizures are presumed unreasonable and that evidence recovered as a result of warrantless searches and seizures is subject to suppression. *See* U.S. Const. amend IV; Tenn. Const. art. I, § 7; *see also Yeargan*, 958 S.W.2d at 629. As a general principle, the police cannot conduct a search without obtaining a warrant. *R.D.S. v. State*, 245 S.W.3d 356, 365 (Tenn. 2008) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)). However, our courts have identified narrow exceptions to the warrant requirement. *State v. Bartram*, 925 S.W.2d 227, 229-30 (Tenn. 1996) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971)). The State bears the burden of showing that the "search was conducted pursuant to one of the exceptions to the warrant requirement." *State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008); *see State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

One such exception to the warrant requirement exists for a search conducted pursuant to valid consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Consent for a warrantless search may be given by the defendant or by "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974); *see State v. Talley*, 307 S.W.3d 723, 734 (Tenn. 2010). Common authority is shown by

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, 415 U.S. at 172 n.7; *see Bartram*, 925 S.W.2d at 231.

Although the Defendant argues that Ms. Robinson's consent to search the home occurred after the deputies entered the home and briefly searched for the Defendant, the

evidence reflects otherwise. Detective Brown's credited testimony reflects that witnesses reported Pig's first name was Marvin and identified Marvin's home and that Detective Brown and two deputies approached the home, knocked on the door, and spoke to Ms. Robinson, who was the homeowner and the Defendant's mother. Ms. Robinson confirmed that the Defendant lived at the home but told Detective Brown that the Defendant was not home. Detective Brown described Ms. Robinson as cooperative and agreeable. Detective Brown requested Ms. Robinson's permission to perform a cursory search of the home to confirm whether the Defendant was there, and Ms. Robinson consented to a brief search. We note that circumstances of the deputies' encounter with Ms. Robinson do not reflect that she was incapable of freely and voluntarily consenting to the search. Although the officers were armed, Detective Brown testified that no firearms were pointed at any of the home's occupants, that the encounter was not hostile, and that he explained the deputies were only looking for the Defendant. It was during the cursory search for the Defendant that the deputies saw contraband in plain view, which led to the deputies' contacting the narcotics division for the purpose of obtaining a search warrant. The record does not preponderate against the trial court's findings that Detective Brown requested and received Ms. Robinson's consent to briefly search the home for the Defendant.

Relative to Ms. Robinson's authority to consent to a search of the Defendant's bedroom, the record reflects that the Defendant lived inside his mother's home. No evidence showed that the Defendant and Ms. Robinson executed a rental agreement or contract. Likewise, although Ms. Johnson testified the Defendant had his own bedroom, no evidence reflects that Ms. Robinson or any other occupant was excluded from the bedroom. To the contrary, the record shows that the Defendant's use of the bedroom was the result of a familial relationship and that all occupants had access to all areas of the home. *See State v. Woods*, 806 S.W.2d 205, 209 (Tenn. 1990). "A valid consent may be given by third persons who have some type of joint authority over the area to be searched." *Id*. We conclude that Ms. Robinson retained joint access and control of the bedroom in which the Defendant resided and that the Defendant's "occupancy of the bedroom was not so exclusive as to deprive" Ms. Robinson of authority to consent to a cursory search of the home.

Therefore, we conclude that the deputies conducted a valid warrantless search of the home pursuant to valid consent by Ms. Robinson. As a result, the search warrant was not tainted because of the previous warrantless entry. The Defendant is not entitled to relief on this basis.

## B. Affidavit and Return on the Search Warrant

Relative to the Defendant's argument that the seized evidence should have been suppressed because the affidavit contained false information, the record reflects that the affidavit stated the following:

> On March 14, 2013, detectives responded to a homicide at [the victim's girlfriend's address], Memphis, TN 38128. Detectives discovered a victim of the homicide to be a black male in his mid-forty's. Detectives spoke with witnesses who identified Marvin Johnson fleeing from the scene of the homicide to his residence[, which is located down the street from the scene of the shooting]. Detectives conducted a knock and talk at [the Defendant's address] and encountered Yolanda Robinson. Yolanda Robinson gave detectives consent to search the residence. Detectives observed, in plain view, what appeared to be marijuana, cocaine, and prescription pills.

The trial court found that the phrase "fleeing from the scene of the homicide to his residence" contained in the affidavit was not false or recklessly made. The court noted that the Defendant could have gone to the residence and left quickly. The court found that the information contained in the affidavit was sufficient for the magistrate to conclude that narcotics violations were occurring at the time of the issuance of the warrant. The court concluded that the search warrant was valid and the evidence properly seized.

In Tennessee, a search warrant must be issued on a finding of probable cause and supported by an affidavit that "sets forth facts tending to establish" probable cause. T.C.A. §§ 40-6-103, -104; *see State v. Williams*, 193 S.W.3d 502, 506 (Tenn. 2006). "Probable cause generally requires reasonable grounds for suspicion, supported by circumstances indicative of an illegal act." *Williams*, 193 S.W.3d at 506 (citing *State v. Stevens*, 989 S.W.2d 290, 293 (Tenn. 1999)). The issuing magistrate should use common sense when determining whether the affidavit supports a finding of probable cause. *State v. Carter*, 160 S.W.3d 526, 533 (Tenn. 2005). We review an issuing magistrate's probable cause determination with great deference. *State v. Melson,* 638 S.W.2d 342, 357 (Tenn. 1982) (citing *United States v. Melvin*, 596 F.2d 492, 498 (1st Cir. 1979)).

The United States Supreme Court has concluded that evidence seized pursuant to a search warrant is subject to suppression when the supporting affidavit includes deliberate or recklessly false statements by the affiant that are material to the establishment of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). Our Tennessee Supreme Court has concluded that two circumstances exist that "authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the [c]ourt . . . and (2)

a false statement, essential to the establishment of probable cause, recklessly made." *State v. Little*, 560 S.W.2d 403, 407 (Tenn. 1978). "Recklessness may be established by showing that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time." *Id.* "[F]raudulent misrepresentation of a material fact will invalidate a search warrant." *Id.* at 406. However, "[a]llegations of negligence or innocent mistakes are insufficient to invalidate the search warrant." *State v. Yeomans*, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999); *see Franks*, 438 U.S. at 171. In order to invalidate a search warrant, the false statement must be "the only basis for probable cause set out in the affidavit." *State v. Tidmore*, 604 S.W.2d 879, 882 (Tenn. Crim. App. 1980). If, however, the false statement is not the only basis for probable cause and the remaining content in the affidavit fails to establish probable cause, the false statement would be fatal to the warrant. *Id.*; *see State v. Norris*, 47 S.W.3d 457, 469 n.4 (Tenn. Crim. App. 2000).

The alleged false statement in the affidavit includes, "Detective spoke with witnesses who identified Marvin Johnson fleeing from the scene of the homicide to his residence." Although the trial court found that the statement was not false, the State concedes in its brief that no witness reported seeing the Defendant flee the scene of the shooting to his residence down the street. The State argues that "in the area of his residence" or "near his residence" would have been more accurate. The statement was inaccurate and, at a minimum, reckless in this regard. In any event, the record reflects that the statement was not a basis for establishing probable cause. Ms. Shelton identified the shooter as a man she knew as Pig and stated she saw Pig run from her driveway where the shooting occurred down the street. Ms. Shelton knew Pig lived in the neighborhood. Witnesses in the area identified Pig as the Defendant and informed the deputies that the Defendant lived in a house down the street from Ms. Shelton's home. Although the statement in the affidavit that the Defendant fled to his residence was incorrect, no evidence shows that the statement was intended to deceive the judicial magistrate or that the statement was a basis for probable cause. The statement, rather, was to explain the reason deputies approached the Defendant's home for a knock-and-talk encounter. The initial warrantless search of the home was conducted pursuant to Ms. Robinson's valid consent, and it was during the limited cursory search that the contraband was seen in plain view. The primary focus of the warrant was the contraband, and the probable cause to support the warrant was based upon the deputies' observing contraband in plain view, not whether the Defendant was seen running to his home after the shooting. The warrant states that the search warrant was for "cocaine, marijuana, prescription pills, firearms, ammunition, drug paraphernalia, forensic evidence including DNA, drug records, and drug proceeds." We note that the homicide detectives did not obtain or execute the search warrant and that narcotics detectives were called to the Defendant's home to address the contraband. Therefore, the warrant was valid and the evidence properly seized. The Defendant is not entitled to relief on this basis.

The Defendant also argues that the warrant was invalid because the return was incomplete in that it did not identify the bullets seized during the search. The trial court found that at the time of the motion to suppress, the return on the warrant had not been "made" as required by Tennessee Rule of Criminal Procedure 41(f) because it failed to mention the .380-caliber bullet seized during the search. The court found, though, that the State had demonstrated the return had been completed by a supplemental pleading filed after the conclusion of the motion hearing.

This court has previously concluded that an "improper return cannot negate the validity of an otherwise legal search." *State v. Robinson*, 622 S.W.2d 62, 75 (Tenn. Crim. App. 1980); *see Squires v. State*, 525 S.W.2d 686, 692 (Tenn. Crim. App. 1975) (stating "the return of an officer upon a search warrant does not affect the validity of the warrant and the officer's execution thereof, and irregularities in regard to the return do not render evidence secured thereunder inadmissible"). In *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983), this court concluded that the failure to list the seized property on the return of a search warrant was an irregularity that did not "in any way affect the admissibility of the evidence seized as a result of an otherwise valid search." (citing *State v. Green*, 613 S.W.2d 229 (Tenn. Crim. App. 1980); *Bishop v. State*, 582 S.W.2d 86 (Tenn. Crim. App. 1979)). In any event, the trial court properly found that the State corrected any irregularity in the return after the suppression hearing. Therefore, the Defendant is not entitled to relief on this basis.

### C. Jail Telephone Call

The Defendant argues that because he was unconstitutionally detained without being afforded an appearance before a neutral magistrate, the portion of the recorded jail telephone call played during the trial should have been suppressed. The Defendant notes his detention from the time he was taken into custody on March 14, at 9:00 p.m., until the formal charges were presented to the judicial commissioner on March 15, at 7:00 a.m., and the failure to allow the Defendant to appear before the judicial commissioner. The Defendant notes he did not appear before a magistrate until March 18. The Defendant concedes in his brief that a judicial commissioner made a probable cause determination within forty-eight hours of his arrest, but he argues his constitutional rights pursuant to *Gerstein v. Pugh*, 420 U.S. 103 (1975), were violated because the probable cause determination was delayed in an effort to gather additional evidence and because he did not appear before the commissioner. Alternatively, the Defendant argues that his detention violated Tennessee Rule of Criminal Procedure 5(a) requiring the State to take a defendant without unnecessary delay before a judicial magistrate.

Relative to the Defendant's detention, the trial court found that the Defendant was taken into custody on March 14, 2013, at 9:00 p.m. The trial court found that after the

-22-

Defendant was transported to the sheriff's office, the Defendant signed a waiver of rights form and denied any involvement in the shooting. The court found that the investigating deputies reviewed the various witness statements, interviewed Ms. Shelton, and requested she attempt to identify the shooter from a photograph lineup. The court noted Ms. Shelton identified the Defendant from the lineup and found that the deputies consulted the District Attorney's Office about the proper charges after reviewing all the evidence. The court found that the investigation was concluded within approximately eight hours. The court found that the decision to charge the Defendant was made on March 15, 2013, at 4:45 a.m. and that he was taken for booking and processing at 6:57 a.m. The court noted March 15 was a Friday. The court found that the arrest warrant was reviewed by a neutral and detached magistrate, a judicial commissioner, who signed the arrest warrant. The trial court found that during the weekend, the Defendant placed telephone calls from the jail, which were recorded pursuant to jail policy, and that during at least one conversation, the Defendant "mentioned that he shot the dude, but it was in self-defense." The court found that the Defendant's arraignment was held on Monday morning.

The trial court found that no unnecessary delay existed between the Defendant's arrest and his appearing at the arraignment. The court found that any delay was incidental and could not be construed as an attempt to overcome the Defendant's "will to resist" or to continue to gather evidence. The court noted all the evidence was obtained before the formal arrest, other than the telephone call. The court found that the relevant telephone conversation was not the product of any questioning or interrogation by a law enforcement officer and that warnings were provided stating all telephone calls were monitored and recorded. The court found that the initial detention was proper and that no unnecessary delay occurred in bringing the Defendant before a magistrate.

When a defendant is subjected to a warrantless arrest, law enforcement is required to take the defendant before a magistrate to seek a "timely judicial determination of probable cause." *Gerstein*, 420 U.S. at 125; *see State v. Huddleston*, 924 S.W.2d 666, 671-72 (Tenn. 1996). "While a delay of less than forty-eight hours is presumptively reasonable, a delay beyond forty-eight hours requires the State to prove that 'a bona fide emergency or other extraordinary circumstance' caused the delay." *State v. Bishop*, 431 S.W.3d 22, 42 (Tenn. 2014) (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57 (1991)). However, "a delay shorter than forty-eight hours may still be considered unreasonable . . . if the delay is 'for the purpose of gathering additional evidence to justify the arrest' or . . . 'motivated by ill will against the arrested individual, or delay for delay's sake.'" *Bishop*, 431 S.W.3d at 42 (quoting *McLaughlin*, 500 U.S. at 56). When a delay is determined unreasonable and unconstitutional, the exclusionary rule applies to "evidence obtained by virtue of a suspect's unlawful detention . . . unless the arrested person's statement was 'sufficiently an act of free will to purge the primary taint' of the illegal detention." *Bishop*, 431 S.W.3d at 42 (quoting

*Huddleston*, 924 S.W.2d at 674-75). Furthermore, when a defendant's arrest is based upon probable cause, the "detention is typically not illegal until it 'ripens' into a *Gerstein* violation." *Bishop*, 431 S.W.3d at 42 (quoting *Huddleston*, 924 S.W.2d at 675). As a result, if the statement "was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." *Huddleston*, 924 S.W.2d at 675.

Relative to the delay between the Defendant's detention at 9:00 p.m. and the judicial commissioner's signing the arrest warrant the next day at 6:57 a.m., the record reflects that sufficient probable cause existed to believe the Defendant was involved in the shooting at the time the Defendant was taken into custody. Although the record reflects that law enforcement continued investigating the shooting after the Defendant was brought to the sheriff's office, no evidence suggests the investigation continued in an effort to establish probable cause to justify the Defendant's warrantless arrest. At the scene, Ms. Shelton identified a man she knew as Pig as the shooter, and other witnesses identified Pig as the Defendant and the home in which the Defendant lived. As a result, at the time of the Defendant's arrest, sufficient information existed to "'warrant a [prudent] person in believing that the [defendant] had committed or was committing an offense.'" *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Because the Defendant was arrested based upon probable cause, the delay between his arrest and the judicial commissioner's probable cause determination was not unlawful. The evidence shows that the delay was to conduct formal interviews of the Defendant and Ms. Shelton, provide Ms. Shelton the opportunity to identify the person she knew as Pig in a photograph lineup, and to consult the District Attorney's Office about the proper criminal charges. Likewise, the Defendant concedes the judicial determination occurred within the presumptively reasonable forty-eight-hour period. The trial court properly denied the motion to suppress on this basis, and we conclude that the Defendant is not entitled to relief.

Relative to the Defendant's argument that *Gerstein* was violated because he did not appear before the judicial commissioner when the probable cause determination was made, the Supreme Court has stated that "the full panoply of adversary safeguards," including counsel, compulsory process, confrontation, and cross-examination "are not essential for the probable cause determination required by the Fourth Amendment." *Gerstein*, 420 U.S. at 120. The Court noted that the only issue to determine is whether "there is probable cause for detaining the arrested person pending further proceedings," which "can be determined reliably without an adversary hearing." *Id*. The Court noted that procedures might vary between States and concluded that the only requirement to satisfy Fourth Amendment concerns was "a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty." *Id.* at 124-25. The Court also concluded that a

probable cause determination in this context is not a critical stage in a prosecution "[b]ecause of its limited function and nonadversary character." *Id.* at 122.

Although the Defendant argues that his lack of appearance at the probable cause determination did not satisfy *Gerstein*, he cites to no legal authority supporting his argument. Our appellate courts have not addressed this issue, but other jurisdictions have concluded that the probable cause determination pursuant to *Gerstein* can be satisfied without an adversary hearing and without the defendant's presence. *See State v. Koch*, 499 N.W.2d 152, 159-60 (Wis. 1993) (concluding that "[t]he arrested person has no right to a physical appearance before a judicial officer for the probable cause determination"). In *King v. Jones*, 824 F.2d 324, 327 (4th Cir. 1987), the court concluded that the defendant "had no right to a face-to-face appearance before the magistrate during the probable cause determination." The *King* court explained,

> The post-arrest *Gerstein v. Pugh* hearing is required to fulfill the same function for suspects arrested without warrants as the pre-arrest probable cause hearing fulfills for suspects arrested with warrants. One who has had an arrest warrant issued before this arrest has had no opportunity to appear physically before the issuing magistrate during the probable cause determination. There is likewise no reason to require such an appearance at the post-arrest probable cause determination.

*Id.*; *see Garcia v. City of Chicago*, 24 F.3d 966, 969-70 (7th Cir. 1994) (concluding that a probable cause determination does not require the presence of the defendant); *In re Walters*, 543 P.2d 607, 617-18 (Cal. 1975) (concluding that a defendant "is not entitled to challenge statements by confronting and cross-examining the declarer [and . . .] has no right to confront and cross-examine the witnesses who testify on the issue of probable cause to detain" pursuant to *Gerstein*). We agree with the reasoning in these cases and conclude that the Defendant's presence at the probable cause determination was not required to satisfy *Gerstein*. As a result, we conclude that *Gerstein* was satisfied and that the Defendant is not entitled to relief on this basis.

Relative to the Defendant's argument that the partial recording of his jail telephone call should have been suppressed because Tennessee Rule of Criminal Procedure 5(a)(1)(B) was violated, the Rule states, "Any person arrested – except upon a capias pursuant to an indictment or presentment – shall be taken without unnecessary delay before the nearest appropriate magistrate[.]" The Rule does not address probable cause determinations pursuant to *Gerstein* but, rather, relates to the initial appearance during which a defendant is informed of the criminal charges and his constitutional rights. In any event, the State concedes in its

brief that a "technical violation" of the Rule occurred because although the Defendant was arrested on March 14, his initial appearance did not occur until March 18.

Our supreme court has concluded relative to Rule 5(a) that "if an individual is not brought before a magistrate within 72 hours, there has been 'unnecessary delay.'" *State v. Carter*, 16 S.W.3d 762, 768 (Tenn. 2001) (quoting *Huddleston*, 924 S.W.2d at 670). However, our courts have concluded that "a delay of seventy-two hours, without more, [does] not render a confession taken during that time inadmissible." *State v. Readus*, 764 S.W.2d 770, 773 (Tenn. Crim. App. 1988). Our supreme court has refused to adopt a per se rule of exclusion relative to a statement made by a defendant during a period of unnecessary delay. *Huddleston*, 924 S.W.2d at 670. To the contrary, our supreme court has concluded that suppression of a confession given during a period of unnecessary delay is required "only if an examination of the totality of the circumstances reveals that the statement was not voluntarily given. *Id*.; *see Readus*, 764 S.W.2d at 774.

The record reflects that the Defendant was taken into custody on March 14, at 9:00 p.m. and that the seventy-two hours would have elapsed on March 17, at 9:00 p.m. The Defendant's initial appearance occurred on March 18. Officer Juaquatta Harris's trial testimony showed that the relevant jail telephone call was placed on March 15, which was well within the seventy-two-hour period. The record reflects that the conversation in which the Defendant admitted involvement in the shooting was with his mother and was not the result of the deputies' questioning the Defendant. Likewise, the evidence shows that inmates at the jail were advised before placing a telephone call that the conversations were monitored and recorded. We conclude that the totality of the circumstances does not reflect that the Defendant's statement to his mother during the telephone call was involuntary or the result of an unreasonable delay. As a result, the trial court properly denied the motion to suppress, and the Defendant is not entitled to relief on this basis.

### III     Autopsy Photograph

The Defendant contends that the trial court erred by permitting an autopsy photograph depicting the victim's face after being cleaned by the medical examiner. He argues that the photograph was irrelevant and used to prejudice the jury because he offered to stipulate that the victim was alive but was now deceased. The State responds that the trial court properly admitted the photograph because it was relevant to identifying the victim. We agree with the State.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Relevant

evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

Photographs of victims "are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978). When determining the admissibility of such evidence, the trial court should consider

> their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Id*. at 951. Unfair prejudice results when there is "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Dotson*, 450 S.W.3d 1, 91 (Tenn. 2014) (quoting *Banks*, 564 S.W.2d at 950-51).

At a jury-out hearing, the prosecutor told the trial court that he intended to use a photograph, which had been taken after the victim's body had been cleaned by the medical examiner, for the purpose of identifying the victim. The Defendant objected, arguing the photograph was unnecessary. The trial court determined that the State had the burden of establishing the victim's identity and of showing the victim was killed. The court overruled the objection after noting that the photograph did not show any wounds or anything "untoward." The court found the photograph was relevant and was not prejudicial. Although trial counsel was willing to make the necessary stipulations to prevent the prosecutor's introducing the photograph, the court noted that the State had the burden of proving guilt beyond reasonable doubt and that the prosecutor was not obligated to accept the stipulation.

We conclude that the trial court did not err by admitting the photograph. The photograph was used during the testimony of Ms. Mosely and the medical examiner to identify the victim and to show the victim was deceased. Although the Defendant offered to

stipulate that the victim was deceased, the State had the burden of establishing the elements of first degree premeditated murder beyond a reasonable doubt, which included proof that the victim was deceased. The photograph is not gruesome, shows only the victim's head and upper chest area, and does not show any blood or injuries. Therefore, the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice. The Defendant is not entitled to relief on this basis.

## IV    Request for Transcripts

The Defendant contends that the trial court erred by denying his request for transcripts of opening statements, closing arguments, and the final jury instructions provided at the trial. He argues that the court's denying his request because he was indigent and unable to afford the cost of the transcripts violated due process and equal protection principles and prevented his preparing a "complete appellate record." The State responds that the trial court properly denied the Defendant's request because he failed to establish the necessity of the transcripts.

"[A]n indigent defendant in a criminal prosecution must be provided . . . the tools of an adequate defense or appeal when those tools are available for a price to other defendants." *State v. Elliott*, 524 S.W.2d 473, 475 (Tenn. 1975). Generally, a transcript of previous proceedings in an indigent defendant's case must be provided when the transcript is "needed to vindicate a legal right." *Id*. at 476. Likewise, "'the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal.'" *Id.* (quoting *Britt v. North Carolina*, 404 U.S. 226, 227 (1971)); *see State v. West*, 767 S.W.2d 387, 402 (Tenn. 1989).

A defendant has the burden on appeal to show "that the transcript was needed to vindicate a legal right." *West*, 767 S.W.2d at 402. A trial court's decision regarding a request for transcripts is reviewed for an abuse of discretion. *State v. Colvett*, 481 S.W.3d 172, 203 (Tenn. Crim. App. 2014). The Supreme Court has stated that appellate courts should consider "the value of the transcript to the defendant in connection with the appeal or trial for which it is sought" and "the availability of alternative devices that would fulfill the same functions as a transcript." *Britt*, 404 U.S. at 227; *see Elliott*, 524 S.W.2d at 476.

The record reflects that at the conclusion of the motion for a new trial hearing, trial counsel submitted to the trial court an order for the preparation of transcripts. The trial judge stated that although he would sign the order, he would not authorize transcripts for opening statements, closing arguments, and the final jury instructions, "barring something being raised." The judge stated that if an issue was raised relative to those portions of the trial proceedings and a transcript was needed, he would "consider it." The judge stated that "they're in there, so if somebody needs to refer to them they are there." The court noted the

defense made no objections during the relevant portions of the trial. Counsel informed the court that appellate counsel was present and had requested the relevant transcripts. The judge responded,

> I understand that and no, barring there be some – I am not having a court reporter transcribe opening, closing, and voir-dire, so that [appellate counsel] can read them at her leisure. She is certainly welcome to go and listen to them and if they find some error that they wish to raise that you, as trial attorney, did not notice, or see, or raise in any way, then by all means, we will get those done. But, I am not doing them in just preparation for that.

> And the instructions are there and as I recall it the lesser includeds that you requested were, in fact, all charged, so that at this time there is no issue around it.

Appellate counsel asked the trial judge, "Your Honor, may I just inquire, if the Court will allow me, is it a matter of costs?" The judge replied, "Yeah, cost and time." Counsel also asked the judge, "So if a private attorney were to ask and be willing to pay the costs, would you grant the motion?" The judge stated, "If they were willing to pay the cost." The judge said, "I'm willing to pay that for you, too, if you are – but, you may listen to it and I would give that same agreement to the private attorney."

We conclude that the trial court did not abuse its discretion in denying the Defendant's request for transcripts of the opening statements, closing arguments, and final jury instructions. Although the court denied the Defendant's request for the relevant transcripts, the court explained that the audio recordings from the proceedings were preserved, that appellate counsel was permitted to listen to the recordings, and that should appellate counsel discover an issue for the appeal, the court would reconsider the request for transcripts. We note that the Defendant has not raised an issue on appeal related to opening statements, closing arguments, or the final jury instructions, although appellate counsel was permitted to review the audio recordings. We, therefore, conclude that the Defendant has failed to establish that the relevant transcripts are needed to vindicate a legal right. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____

ROBERT H. MONTGOMERY, JR., JUDGE